46 So.2d 848

### CRUMPTON v. PILGRIM HEALTH & LIFE INS. CO.

3 Div. 919.

Court of Appeals of Alabama.

June 6, 1950.

364

———◆———

John A. Sankey, of Montgomery, for appellant.

Walter J. Knabe, of Montgomery, for appellee.

CARR, Judge.

J. A. Crumpton, plaintiff below, recovered a judgment against the Pilgrim Health and Life Insurance Company. The basis for the suit is a policy of insurance on the life of Franklin Williams, a stepson of Crumpton, the beneficiary. The nature of the policy is such that a physical examination was not required for its issuance.

After verdict and judgment, the trial court granted the defendant's motion for a new trial. This appeal is by the plaintiff, and he here complains of this action of the court below.

The order granting the motion does not disclose on what ground it was granted. In this state of the record, the judgment must be sustained on review if we conclude that it was authorized on any ground assigned in the motion. Peyton v. Lewis, 10 Ala.App. 360, 64 So. 472; Bridgeforth v. National Life & Acc. Ins. Co., 25 Ala.App. 75, 140 So. 770; W. M. Templeton & Son et al. v. David, 233 Ala. 616, 173 So. 231; American Mutual Liability Ins. Co. v. Louisville & N. R. Co., 250 Ala. 354, 34 So.2d 474; Martin v. Birmingham Southern R. Co., 250 Ala. 583, 35 So.2d 339; Camp v. Atlantic Coast L. R. Co., 251 Ala. 184, 36 So.2d 331.

One ground of the motion is that the verdict of the jury is against the great weight of the evidence. We entertain the view that the action of the court below must be sustained on this ground. We will, therefore, confine our discussion to this aspect of the review.

At the time the policy was issued, the appellant was soliciting agent of the appellee. His duties were to solicit applications for insurance policies and collect premiums.

The insured was about thirteen years of age and lived in the home with his mother and appellant.

The application for the policy bears date of March 11, 1948. The insured's name appears over "Signature of Applicant." The policy was issued on March 22, 1948.

The mother of the boy was first named as beneficiary. However, this relationship was changed and the appellant was made bene-

ficiary on January 28, 1949. The insured died of Hodgkin's disease on April 2, 1949.

In the application some questions and answers are as follows: "Weight *Average* Lbs." "Are you now in sound health? Yes." "Give date of last illness *None* Disease *None.*"

Dr. Dungee testified that he treated the insured in August 1947. In pertinent parts, he stated:

"A. When the child was brought to me in August, 1947, he presented the appearance of a child of eleven years or thereabout in age. The complaints were those that are attributed to a child who would be approximately, you might say, at the period of adolescence. He was showing symptoms that were not peculiar to many children at some time. At that particular time he was complaining of little—well, he would sometimes feel like eating, sometimes he wouldn't. He was troubled with some trouble with his elimination. Other than that, I found nothing to present itself for my attention. Nothing at that particular time, nothing that would lead me to believe that he had any serious malady or serious disease. I gave him something to build him up, in other words, a tonic. Something to help the little fellow begin more regularity in his elimination and his eliminative system and as far as I can remember, for some two or three months after that the child seemed to have improved. In fact, he made, I think there was, three visits to my office in a period of about six weeks."

"Q. Hodgkin's disease, how long does it take that disease to develop?

"A. Generally, Mr. Sankey, from the beginning of the disease until its end, from two to three years. It generally develops between the ages of from fifteen to thirty-five."

A blood test was not taken by this physician.

Dr. Jabour examined the insured on May 5, 1947. He testified in part:

"Q. Now, when you examined him, what was your diagnosis? A. The only diagnosis there could be made at that time was secondary anemia.

"Q. What is secondary anemia? A. It is a condition due to depletion of the blood from elimination trouble. In many cases it usually follows some other condition, existing condition. Might be due to a cold and pneumonia or anything of that character.

"Q. That is, ordinarily, not considered a critical condition? A. Rather, it is indicative of some other trouble. It isn't a serious condition. Secondary anemia is just a slight depletion of the bood.

"Q. At that time, you took a blood-test? A. Yes, I did.

"Q. After this, when was the next time you saw this child? A. I think I saw him shortly after, the following week or two weeks later.

"Q. What did you do for him on this occasion? A. Well, he didn't have any energy because of the anemia. I checked him and—

"Q. Did you find any swelling under his arms or in his neck at that time, or in his groin? A. There was no indication of any swelling.

"Q. Did he seem to be a child who was in apparently good health? What was his general appearance? A. His general appearance was quite good. He was quite bright and alert, too. The fact is, that his condition was such that when I first saw him, I couldn't believe that he was sick at all."

The doctor also testified that Hodgkin's disease involves the lymphoid glands and makes its appearance in the neck; that the condition of the insured was not definitely diagnosed as this malady until January 1949; that "it could not be detected and it was not detected. And he had gone to see some outstanding doctors, Doctor Blue, Doctor Boozer, Doctor Thigpen and others and all these, none of them could diagnose it. None of these glands began to appear at the time they first saw the child"; that according to the history of the case there was something wrong with the insured beginning in 1947 and continuing up until his death.

The testimony of Sister Mary Dennis disclosed that the insured entered St. Jude School in September 1946; that in Novem-

ber of that year he complained of severe abdominal pains; that he remained enrolled in the school through May 1947, from which time he never returned.

There was evidence from neighbors that during the years 1947 and 1948 the boy was seen around the neighborhood and he appeared to be a normal child.

The appellant testified that he thought his stepson was all right at the time the application for the policy was executed; that he (appellant) filled out the application blanks and answered the questions which we have set out supra; that he knew at the time that the insured had been treated in 1947 by Drs. Jabour, Boozer, Blue, and Dungee. The appellant testified that he did not recall that Dr. Weil had treated the boy. However, he did admit in his testimony that in the proof of death, to which he had sworn, he had included the statement that Dr. Weil had treated the insured.

We have attempted to recite the tendencies of the evidence in some detail. This will afford a fair and illustrative presentation of the question of instant concern.

The policy of insurance contains this provision: "The insured and beneficiary, by an application and by the acceptance and retention of this policy, warrants that he is alive and in sound health on the date of the application for said policy, and on the date of the delivery of the policy. The insured and beneficiary warrant that answers to all questions contained in the application are true and that any breach of any of such warranties shall void the policy."

Without elaboration or discussion, we will state some legal principles which are pertinent to this review.

■ Hodgkin's disease is a malady which materially increases the risk of loss. New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277.

Section 6 of Title 28, Code 1940 provides: "No written or oral misrepresentation, or warranty therein made, in the negotiation of a contract or policy of insurance, or in the application therefor or proof of loss thereunder, shall defeat or void the policy, or prevent its attaching, unless such mis-

representation is made with actual intent to deceive, or unless the matter misrepresented increase the risk of loss." See also, Pacific Mutual Life Ins. Co. of California v. Edmondson, 235 Ala. 365, 179 So. 185.

■ It will be noted that in the above code section there are provided two alternatives, "unless such misrepresentation is made with actual intent to deceive" and "unless the matter misrepresented increase the risk of loss." It is not required that both alternatives concur. In the event of the proof of the latter alternative the applicant's innocence of any bad motive becomes an immaterial factual issue. All States Life Ins. Co. v. Johnson, 239 Ala. 392, 194 So. 877.

■ The relationship existing between agent and principal is a fiduciary one. In all transactions affecting the subject matter of the agency, it is the duty of the former to act with utmost good faith and loyalty. In accepting the agency, the agent impliedly, if not expressly, undertakes to give his principal his best judgment and decisions. Myers v. Ellison, 249 Ala. 367, 31 So.2d 353; Seeberg v. Norville, 204 Ala. 20, 85 So. 505; Render & Hammett v. Hartford Fire Ins. Co., 33 Ga.App. 716, 127 S.E. 902; Dudley v. Colonial Lumber Co., 223 Ala. 533, 137 So. 429; St. Paul Fire & Marine Ins. Co. v. Laubenstein, 162 Wis. 165, 155 N.W. 918.

■ The principal has a right to presume that the representations made to him by his agent are true and accurate. Ellis v. Jones, 121 Cal.App. 325, 8 P.2d 933.

■ "Bad faith on the part of the agent is presumed where he takes unto himself, either directly or indirectly, an advantage at the expense of the principal, no matter how innocently he may have proceeded according to his own standards of right and wrong." 3 C.J.S., Agency, § 139, p. 12.

■ In the case at bar it may be said that there is sufficient evidence to go to the jury on the inquiry as to whether or not the insured was afflicted with Hodgkin's disease prior to or at the time the application for the policy was made. Even so, this, of itself, would not compel us to disturb the

judgment of the trial judge in his action in granting the motion for a new trial.

There are other evidential factors which could have influenced the lower court to conclude that the great weight of the evidence was contrary to the verdict of the jury.

The evidence we have delineated speaks for itself and needs no analysis from us.

The experienced and able trial judge heard the testimony of the various witnesses. He had the privilege to observe their manner and demeanor. His opportunity to evaluate and weigh the evidence far exceeds the advantage afforded to us.

The rule for the review of appellate courts on a judgment granting a new trial on the ground that the verdict is contrary to the great weight of the evidence is discussed at length in Cobb v. Malone, 92 Ala. 630, 9 So. 738, 740. In this case it is stated that such judgment "will not be reversed, unless the evidence plainly and palpably supports the verdict."

In matters of instant concern the appellate courts must indulge some presumption in favor of the conclusion of the lower court. Parker et al. v. Hayes Lumber Co., 221 Ala. 73, 127 So. 504.

In the case of Cook v. Sheffield Co., 206 Ala. 625, 91 So. 473, Chief Justice Anderson, writing for the court, held that the same presumption prevails in favor of the lower court's ruling where the motion is granted as when the motion is denied.

"It is the duty of the court to set aside a verdict and grant a new trial, though the evidence is in conflict, if the trial court has a definite and well-considered opinion from the evidence that the verdict failed to do justice under the proper pleadings directing and guiding the trial." Schaeffer v. Walker, 241 Ala. 530, 3 So.2d 405.

We find ourselves unable to agree with able counsel for appellant in his insistence that we should disturb the judgment of the trial judge in the case at bar.

This judgment is due to be affirmed. It is so ordered.

Affirmed.