Gloria L. SCHRADER, Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee.

No. 17927.

United States Court of Appeals
Fifth Circuit.
June 9, 1960.

356

Robert R. Tench, Leon Whitehurst, Jr., Clearwater, Fla., for appellant.

John Bell, John Arthur Jones, Tampa, Fla., Knight & Bell, Tampa, Fla., for appellee.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is an action on a life insurance policy.[1] The plaintiff-appellant, Gloria L. Schrader, is the beneficiary of the policy and the widow of the insured, Richard M. Schrader. Schrader acted in a dual capacity: he was both the insured and the agent writing the policy; he received his agent's commission for the sale of the policy. The insurer, the Prudential Insurance Company of America, cancelled the policy and refused payment on the ground that the insured made fraudulent, material representations in the application for insurance. The principal question presented on this appeal is whether the insurer waived its right to cancel the policy or is estopped to deny liability. The district court granted a judgment for the insurer notwithstanding a jury verdict in favor of the beneficiary. We affirm.

## I.

In 1953 the insured, Richard M. Schrader, became an employee of the Prudential. He executed the usual agent's agreement that provided, among other things, he had no authority to allow the delivery of any policy on behalf of the company unless the person insured was in good health. Schrader was a debit agent; he made collections and sold insurance. He was one of six agents at Clearwater, Florida under the supervision of staff Manager Charles J. Stevenson. Stevenson was one of six staff members under the supervision of Manager Jacob Vonk of the insurer's district office in St. Petersburg, Florida.

From July 1951 until his death, Schrader was a patient of Dr. Douglas W. Carr, a general practitioner in Clearwater. June 23, 1953, Dr. Carr removed a small black mole from Schrader's back. Several days later a pathologist with the Mills & Patterson Laboratory in Tampa, Florida, reported by letter to Dr. Carr that the mole was cancerous, a "malignant melanoma arising in a junction nevus".[2] Another pathologist with the same laboratory discussed the lesion with Dr. Carr and suggested that the patient be observed at intervals of four to six months for recurrence of the malignancy.

As an employee of the insurer, Schrader was covered by a group hospitalization and accident policy entitling him to receive certain salary benefits when unable to work because of illness. After removal of the mole he promptly filed a claim under his group hospitalization policy. The claim, signed by Schrader's immediate superior, Stevenson, revealed the removal of a malignant skin tumor. This information was placed in a card index file at the district office in St. Petersburg. The Prudential's claims department paid the claim.

Dr. Carr had Schrader come back on June 26, June 29, and July 7, 1953, for removal of sutures and treatment of a minor infection in the wound. Meantime, the diagnosis of malignant melanoma was confirmed by the Armed Forces Institute of Pathology in Washington, to which the specimen was sent for examination. Dr. Carr discussed the findings with Schrader, told him that the growth was malignant, told him of the possible seriousness of his condition, and suggested that he come back in four or six months for further examination.

Schrader was examined again October 5, 1953 and January 11, 1954. Dr. Carr found no lumps, masses, or other evidence of lesions. May 3, 1955, Schrader complained to Dr. Carr of some tender masses under his right arm, in the side of his chest, and in the right groin. The

---

1. The policy included $5,000 straight life insurance and term insurance for twenty years starting at $20,000 and decreasing $1,000 each year of the term. The premium, $7.08 a month, remained the same for the premium paying period of sixteen years. Mrs. Schrader sued for $24,160.

2. Dr. Patterson, the pathologist, testified that "the malignant melanoma is the most malignant of all tumors. It is rapidly growing and usually kills the person in a short period of time."

masses had been present for about four or five weeks. Dr. Carr suspected they might have some connection with the malignancy, told Schrader of his suspicions and recommended that he see a surgeon, Dr. Lockwood, in Clearwater. Dr. Carr arranged an appointment for Schrader with Dr. Lockwood for May 12, 1955.

On that very same day, May 3, 1955, Schrader dated and signed Part One of his application for the insurance policy that is the subject of this action. The next day he presented himself to Dr. J. O. Norton, the insurer's examining physician, for the required medical examination. Schrader himself filled in Part Two of the application, that contains the false or incomplete answers set forth in the insurer's defenses.[3] He signed it both as the proposed insured and also as the insurance agent. Dr. Norton completed the reverse side of Part Two, signed it, and mailed the application to the insurer's south-central home office in Jacksonville, Florida. An underwriter and clerks in the underwriting division handled the application in the usual, routine manner. The application disclosed no warning of any impairment of health. May 17, 1955, the underwriter approved it and the insurer issued the policy.

The office in Clearwater received the policy May 19. A clerk gave the policy directly to Schrader; he was the agent for delivery as well as the insured. He received an agent's commission for the sale of the policy.

Schrader failed to keep his appointment with Dr. Lockwood on May 12, 1955. That was before he received the policy. On May 20, however, the day after he received the policy, Schrader reported to Dr. Lockwood for surgery. Dr. Lockwood performed an excisional biopsy on May 21. He removed two tumors in their entirety for submission to the pathologists, Mills & Patterson Laboratory, for study. The laboratory advised Dr. Lockwood that the growths were "Metastatic melanoma". Schrader was discharged from the hospital May 25. He visited Dr. Lockwood eight times for post-operative care.

In June 1955 Schrader submitted a claim under his hospitalization policy similar to the claim filed in 1953. It was signed by Alice Simmons as office supervisor of the St. Petersburg district office. On the reverse of the form Dr. Lockwood had signed a statement showing an "excision of malignant lesion of lymph node". In June 1955, November 1956, and February 1957 Schrader submitted claims for disability pay for time lost from work because of illness. The June 1955 claim contained Dr. Lockwood's statement regarding the nature of the surgery; the November 1956 claim contained a statement by Dr. Carr regarding Schrader's tension headaches; the February 1957 claim contained a statement regarding Schrader's last illness.

Schrader returned to the hospital October 25, 1956, complaining of severe headaches. He was discharged November 14, 1956, but reentered November 25, 1956. He died February 2, 1957. A biopsy showed a malignant melanoma of the brain. That was the cause of his death.

---

**3.** The false or incomplete answers set up as defenses by the insurer are as follows: (a) Schrader answered "No" to the question whether he had consulted or been attended by a physician for any reason during the past five years; this fraudulent answer concealed his visit to Dr. Carr and the removal of the mole. (b) By an incomplete answer to the same question Schrader concealed the later consultations with Dr. Carr concerning the lumps in his right chest and right groin area. (c) He answered "No" to the question whether he had ever had, among other diseases, tumors, cancer, a growth, or any indication of any blood, skin or gland disorder; this concealed the diagnosis of the mole as a malignant tumor which Schrader was aware of before filling in the application. (d) By the same false answer Schrader concealed his consultation with Dr. Carr concerning the lumps and Dr. Carr's advice to have them removed. (e) He answered "No" to the question whether he had ever had any diagnostic studies, thus concealing the diagnosis of the mole as a malignant tumor.

By just a few weeks the policy was still within the two year contestable period when Schrader died. The insurer refused payment on the policy, but offered to return the premiums paid, plus interest. Mrs. Schrader brought suit on the policy.

## II.

■ The only issue is whether the trial court erred in granting the judgment notwithstanding the verdict. A motion for a directed verdict, or for a judgment notwithstanding the verdict, raises a question of law only: is there any evidence or any inference reasonably to be drawn from the evidence that would authorize a verdict against the movant. Marsh v. Illinois Cent. R. Co., 5 Cir., 1949, 175 F.2d 498; Foreman v. Texas & New Orleans R. Co., 5 Cir., 1953, 205 F.2d 79; Audirsch v. Texas & Pacific Ry. Co., 5 Cir., 1952, 195 F.2d 629; Kippen v. Jewkes, 10 Cir., 1958, 258 F.2d 869.

Mrs. Schrader does not seriously contest the evidence showing the fraudulent misrepresentations on the part of the insured. She contends that the insurer knew or should have known the true facts and thereby waived this objection or is estopped to deny liability. Mrs. Schrader argues that the insurer is chargeable with knowledge of the true facts either because of knowledge of its agents or because of information in its records.

### A. Dr. Norton's examination.

Dr. Norton, the insurer's physician, examined Schrader May 4, 1955, and found nothing wrong with the insured. Mrs. Schrader argues that the lumps in Schrader's breast and groin were obvious at that time,[4] and that Dr. Norton knew or should have discovered the cancerous condition. Relying on Wingo v.. New York Life Ins. Co., S.C.1919, 101 S.E. 653, she argues that since Dr. Norton, the insurer's examining physician, did not think the lumps were of particular concern, his clearance constitutes a waiver by the insurer. The Wingo case differs materially from the present case. In Wingo there was less evidence of fraudulent misrepresentation than in the instant case. The application contained an inquiry whether the applicant believed that he suffered from tuberculosis and the jury could have found that the applicant answered "no" to this inquiry in good faith, for the only evidence tending to show that he knew he had tuberculosis was the testimony of a physician who examined him four years before the application.

■ Dr. Norton, testifying three years after examining Schrader, did not remember anything at all about the examination. He said that he might have failed to find the lumps on Schrader or he might have found them and considered them insignificant, in the light of Schrader's failure to state his past medical history. The crucial fact is that Schrader furnished a false history to Dr. Norton, as is evident from his signed application. To hold, in the circumstances of this case, that the insurer waived its right to cancel because the examining physician did not find anything wrong with the applicant would put a premium on concealment and falsification.

### B. Stevenson's knowledge.

Stevenson was Schrader's immediate supervisor. He introduced Schrader to Dr. Norton. He signed Schrader's claim for group hospitalization benefits. Mrs. Schrader argues that Stevenson knew of the claim showing a "removal of malignant skin tumor from back" and knew the insured was entering the hospital for surgery when the policy was delivered on May 19, 1955. She points out

---

4. Dr. Carr, Schrader's personal physician, had examined him on May 3, 1955. Dr. Carr testified that on that date the lumps under the right arm and in the groin area were visible without touching them. But Schrader had called Dr. Carr's attention to these two areas, for the lumps had been present and tender for three or four months although the groin area was no longer tender at the time of the examination.

that he was aware of Schrader's absence from work in October 1956 and that Stevenson had a duty, even after the delivery of the policy, to refer any information to the company that might bear on the insured's state of health.

It is evident to us from the record that Stevenson either had no knowledge of Schrader's untruthful answers in the application or that he colluded with Schrader and intended to conceal such knowledge from his superiors. Stevenson denied knowledge of removal of the malignant skin tumor and denied knowledge of the statement in the claim revealing the nature of Schrader's operation by Dr. Carr. He testified that he did not know why Schrader entered the hospital the day after receipt of the policy, and that he did not become aware of the true nature of Schrader's illness until after Schrader was operated on in November 1956.

■ Stevenson did not see Part Two of the application, the medical part, for this was filled out in Dr. Norton's office and forwarded by him to the insurer's Jacksonville office. Stevenson could assume that his fellow agent, Schrader, had not breached faith with the company by falsifying the application. But we need not decide whether Stevenson actually knew of Schrader's true condition. Even if he had known, his knowledge should not be imputed to the company. If he knew, the only inference to be drawn from his failure to act on such knowledge is that he intended to cooperate with Schrader. There is nothing in the record to show that, acting for the company, he intended to waive, or had the authority to waive, the requirement that the insured make true representations in the insurance application. As the Supreme Court of the United States pointed out in Mutual Life Ins. Co. of New York v. Hilton-Green, 1916, 241 U.S. 613, 36 S.Ct. 676, 680, 60 L.Ed. 1202:

> "But this general rule [the knowledge of the agent is imputed to the company] does not apply when the third party knows there is no foundation for the ordinary presumption,—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing * * *. The assured at the least consciously permitted an application containing material misrepresentations to be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed; and later he accepted policies which he must have understood were issued in reliance upon statements both false and material. He could claim nothing because of such information in the keeping of unfaithful subordinates. Moreover, the false representations accompanied and were essential parts of the policies finally accepted. He did not repudiate, and therefore adopted and approved, the representations upon which they were based."

See also Aetna Life Ins. Co. v. Routon, 1944, 207 Ark. 132, 179 S.W.2d 862; 29A Am.Jur., Insurance, § 1023; 44 C.J.S. Insurance § 155. "The rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own frauds upon the principal." State ex rel. Prudential Ins. Co. of America v. Bland, 1945, 354 Mo. 495, 190 S.W.2d 234, 236.

C. The insurer's group policy files.

Mr. Vonk, the district manager in St. Petersburg, testified that he did not become aware of Schrader's illness until Schrader was ready to be operated on for a brain tumor in November 1956. Mrs. Schrader insists that Vonk knew or should have known of the malignancy prior to that time. There is no evidence of independent knowledge on the part of Vonk. This contention depends, therefore, on whether the underwriting division of an insurance company, when con-

sidering an application for life insurance, is chargeable with information contained in the records of claims paid under group policies of the employees. At the time Schrader applied for life insurance there was on record in the claims department of the insurer, a report of the removal of a malignant skin tumor from Schrader's back.

■ Generally, an applicant is under no duty to disclose to an insurance company matters already known to the company. 12 Appleman, Insurance Law and Practice Section 7272. A proper consideration, however, of the question whether information in the files of the group hospitalization division of the insurer is imputable to the underwriting division requires some explanation of the method for processing applications for individual life insurance as against group insurance. The Prudential subscribes to the Medical Index Bureau, an independent organization that acts as a central clearing house for the exchange of information among insurance companies.[5] Any impairment of health that is noted either on an *individual* hospitalization policy or an application for life insurance is forwarded to M.I.B. This information is available to all insurance companies reviewing applications for insurance. However, an impairment of health presented as a claim under *group* hospitalization is not forwarded to the M.I.B.

The insurer maintains its own files for recording significant information in reference to physical impairments, but these files do not contain impairments stated in claims under group hospitalization and it is not company policy to check group policy claims for information useful in denying an application for life insurance. It is fair to assume that Prudential agents knew this and realized that evidence of an impairment on a claim under group insurance would not be disclosed in the ordinary processing of an application for individual life insurance. Prudential handled Schrader's application in the same manner as any other application for $25,000 worth of life insurance. An underwriter checked Prudential's files, *except the group policy files*. The files of M.I.B. were checked. The insurer hired the Hooper-Holmes Bureau to make a personal check of Schrader's health, habits, and reputation. It is clear that Schrader's application received neither more nor less attention because he was an employee of the insurer; it was processed in the usual, customary manner.

A witness for the insurer testified that the Jacksonville home office alone contained some eleven hundred group policies covering more thousands of lives than he would attempt to count. The Prudential used different systems for handling the various group claims. Some employers handled the entire claim and kept the information concerning impairments in their own files; the insurer saw the claim only for accounting purposes. Extending M.I.B. coverage to all impairments in group hospitalization claims would involve gathering all this information from various employers.

■■ It seems unreasonable to hold this insurer to a knowledge of the information in its group hospitalization records when, as appears here, it was so impracticable and costly to transcribe the records of physical impairments from the group policy claims to the underwriting department or to the M.I.B. that it was contrary to company policy to search the group hospitalization records in processing individual insurance. It has been held that information in the records of another branch of the government, or a different branch of the Veterans' Administration itself, is not chargeable to the insurance service.[6] In Unit-

5. This Court has previously shown familiarity with the M.I.B. See New York Life Ins. Co. v. Strudel, 5 Cir., 243 F. 2d 90.

6. United States v. Willoughby, 9 Cir., 1957, 250 F.2d 524; United States v. Sinor, 5 Cir., 1956, 238 F.2d 271, certiorari denied, 1957, 353 U.S. 985, 77 S.Ct. 1287, 1

ed States v. Willoughby, 9 Cir., 1957, 250 F.2d 524, an insured made false representations in applying for reinstatement of national service life insurance. The court held that the Insurance Service of the Veterans' Administration was not bound, or estopped, by the Administration's failure to examine the Veterans' disability compensation file. There is a difference between the Government and a private insurance company, and between the relationship of the Government to veterans and the relationship of an insurance company to an insured. But the principle underlying Willoughby and similar cases is applicable here: in the interest of processing expeditiously a great volume of business, the insurer is entitled to rely on the representations of an insured, without checking all its files to determine if the insured is committing a fraud. In Great Northern Life Insurance Co. v. Vince, 6 Cir., 1941, 118 F.2d 232, 236 the court held: " * * * [E]ven its own earlier records do not put the insurer upon notice of the falseness of statements in an application unless there is some circumstance which directs attention to them."

A considerable part of the low cost of group hospitalization insurance is attributable to handling the insurance on a group basis and not on an individual basis. This Court is not willing to require that an insurance company go to the extra expense, passed on to policy holders by way of higher premiums, of handling health impairments in group insurance in the same manner as health impairments in individual insurance, where the applicant has consciously misrepresented the true facts in breach of his duty of good faith. As Judge Tuttle stated, in another context, in New York Life Ins. Co. v. Strudel, 5 Cir., 1957, 243 F.2d 90, 94: "The law is not that tender toward those who fail in their responsibility to exercise the necessary good faith in their dealings with others."

III.

We do not base our decision solely on the general proposition that an insurance company's underwriting division is not chargeable with information contained in the files covering group insurance. We have before us a specific case involving three salient facts: (1) the insured obtained a policy fraudulently by withholding information he should have disclosed and by giving information he knew to be false; (2) as a Prudential agent, Schrader knew or had reason to know that the damaging information on his claims under his group hospitalization policy would not be disclosed in the routine processing of his "clean" application for an individual life insurance policy; (3) as the insured and as the agent writing his own insurance, Schrader was in a dual position putting him under a high obligation to act in good faith and loyalty to his employer. This third element colors every aspect of this case.

██ Applicants who are strangers to an insurance company are bound to exercise good faith in answering questions on an application. Mutual Life Ins. Co. of New York v. Hilton-Green, 1916, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202; Prudential Ins. Co. of America v. Whittington, Fla.App.1957, 98 So.2d 382; Mutual Life Ins. Co. of New York v. Denton, 1927, 93 Fla. 276, 112 So. 53. An insurance agent writing insurance on himself is held to higher standards. The confidential relationship between an insurance company and its agents is recognized by statutory law in Florida. This Court has recognized the high duty of an agent when applying for insurance on his own life:

"McDaniel occupied a highly confidential fiduciary relationship with the company, and it was his duty, more than that of a third person applying for insurance, to disclose any facts to his principal that might

L.Ed.2d 1144; Halverson v. United States, 7 Cir., 1941, 121 F.2d 420, certiorari denied 314 U.S. 695, 62 S.Ct. 412, 86

L.Ed. 556. But see United States v. Kelley, 9 Cir., 1943, 136 F.2d 823.

have resulted in rejecting his application for reinstatement of the policy and additional insurance. There is no doubt his suppression of facts material to the risk, which he knew before the policies were delivered, was actual and legal fraud, rendering the contested insurance voidable." McDaniel v. United Ben. Life Ins. Co., 5 Cir., 1941, 117 F.2d 339, 341.

See the cases collected in Crumpton v. Pilgrim Health & Life Ins. Co., 1950, 35 Ala.App. 363, 46 So.2d 848, and Aetna Life Ins. Co. v. Routon, 1944, 207 Ark. 132, 179 S.W.2d 862.

An insurance agent is under a duty to exercise good faith and loyalty toward his company, to make full disclosure to the company, and to obey instructions. This duty is increased, not diminished, when the agent becomes an applicant for insurance. Appleman says:

"The position of a life insurance agent taking out a policy in the company on his own life requires that he act in good faith in the observance of the company's rules and regulations relating to the delivery of policies. While procuring insurance for himself, the agent does not act as the agent of the insurer but on his own behalf. And any agent having an interest adverse to the insurer must disclose such interest, or the policy is unenforceable." 16 Appleman, Insurance Law and Practice § 8737.

In Crumpton v. Pilgrim Health & Life Ins. Co., 1950, 35 Ala.App. 363, 46 So.2d 848, 851, a soliciting agent secured a policy on the life of his stepson from the company for whom he worked. The policy did not require a physical examination before issuance. The court delineated the duty owed by the agent in the following terms:

"The relationship existing between agent and principal is a fiduciary one. In all transactions affecting the subject matter of the agency, it is the duty of the former to act with utmost good faith and loyalty. In accepting the agency, the agent impliedly, if not expressly, undertakes to give his principal his best judgment and decisions. Myers v. Ellison, 249 Ala. 367, 31 So.2d 353; Seeberg v. Norville, 204 Ala. 20, 85 So. 505; Render & Hammett v. Hartford Fire Ins. Co., 33 Ga. App. 716, 127 S.E. 902; Dudley v. Colonial Lumber Co., 223 Ala. 533, 137 So. 429; St. Paul Fire & Marine Ins. Co. v. Laubenstein, 162 Wis. 165, 155 N.W. 918.

"The principal has a right to presume that the representations made to him by his agent are true and accurate. Ellis v. Jones, 121 Cal.App. 325, 8 P.2d 933."

In Powell v. North State Mut. Life Ins. Co., 1910, 153 N.C. 124, 69 S.E. 12, the insured was an agent or local manager of the insurer. In his application he made a false and material representation as to his habit of using opium. The Supreme Court of North Carolina, in ordering a new trial, pointed out that the position of a life insurance agent taking out a company policy on his own life requires that he act in good faith and in observance of the company's rules and regulations relating to the delivery of policies.

In Aetna Life Ins. Co. v. Routon, 1944, 207 Ark. 132, 179 S.W.2d 862, 863, the applicant was not an agent for the insurer, but he was its medical examiner. In his application for a non-medical policy, he concealed the fact that he had heart trouble and hypertension because he knew the company would require an urine test if he disclosed this information. The insurer's agent, Clark, filled in the application with the false answers. The Court held that the fraud vitiated the policy regardless of whether the applicant concealed his condition from the agent or colluded with the agent to conceal it from the insurer, or whether the agent alone made the false answers. The Supreme Court of Arkansas stated:

"It must be remembered that the insured, Dr. Routon, at the time he knew false answers to material questions in his application were being made by Clark, was the trusted representative, or medical examiner, in the locality in which he lived, for appellant [insurer]. In no sense was he dealing with appellant at arms-at-length. If, as contended by appellee, appellant's agent, Clark, knew the insured's condition and knew that the answers which he, Clark, wrote in the application were false, yet, the fact remains that Dr. Routon also knew that these answers were false and material, that he was not an insurable risk, and that appellant would refuse to issue the policy in question if it knew that he was suffering from high blood pressure. In this event, there was both fraud and collusion on the part of the insured and Clark, appellant's agent, in procuring the insurance, which would void the policy."

■ In a number of cases when an agent secured insurance on property owned by him the courts have held that the agent is in a position of higher responsibility than an ordinary applicant, and is therefore bound to the utmost good faith in his disclosures. To withhold knowledge of any material fact in such cases is a fraud on the insurer, sufficient to avoid the policy. Westchester Fire Ins. Co. of New York City v. Fitzpatrick, 3 Cir., 1924, 2 F.2d 651; Ingram v. Fidelity-Phoenix Fire Ins. Co., 8 Cir., 1926, 16 F.2d 251; 29 Am. Jur., Insurance § 155.

■ Schrader answered fraudulently material questions in his application and accepted delivery of a policy when he knew that he was not in good health. The insurer did not waive its right to cancel, nor is it estopped to deny liability. Waiver and estoppel apply when the insured is deceived or misled to his detriment, not when an insured invokes waiver and estoppel in order to make his fraud effective. Viewing the evidence in a light most favorable to the plaintiff, we agree with the district judge that there was no evidence and no inference that might be reasonably drawn from the evidence that would sustain a recovery by the plaintiff.

The appellant's specifications of error relating to the trial judge's instructions to the jury are not properly before this Court, since the jury found for the plaintiff.

Affirmed.