**Patricia J. PEDERSEN, Appellee,**

**v.**

**LIFE OF MID–AMERICA INSURANCE COMPANY, a Corporation, Appellant.**

**No. 53119.**

Supreme Court of Iowa.

Jan. 14, 1969.

Rehearing Denied April 7, 1969.

Thomas W. McKay, Hughes & McKay, Dubuque, for appellant.

J. R. Miller, Miller, Miller & Miller, Cherokee, for appellee.

STUART, Justice.

Plaintiff, the designated beneficiary, brought this action in equity for declaratory relief seeking to establish a binding insurance contract with defendant on the life of her husband who was killed while the application was being processed. The trial court held for plaintiff. The company appealed.

The deceased, a bank cashier and part time insurance agent for defendant company, made application for insurance on his own life, paid the quarterly premium and passed the required physical examination on March 14, 1967. Three days later, before the policy was issued, he was killed in a one car accident.

Plaintiff claims March 14, 1967 was the effective date of the policy under the terms of the conditional receipt delivered by applicant as agent to himself as the insured when he paid the premium. The receipt reads as follows:

"It is understood and agreed that this premium payment is made and accepted subject to the following conditions:

"1. That if the Company after investigation shall be satisfied that on the date hereof, or on the date of the medical examination * * *, whichever is later, the Proposed Insured was insurable and entitled under the Company's rules and standards to insurance on the plan and for the amount applied for at the Company's published rates corresponding to the age of the Proposed Insured and shall approve said Application, the insurance protection applied for shall by reason of such payment take effect on the date hereof * * or from the date of such medical examination * * * whichever is later."

The company claims: (1) The defendant was uninsurable as a moral risk because of alleged shortages and discrepancies in some bank accounts to which he had access. (2) The representations deceased made as agent for defendant on the application for life insurance on his own life were false and fraudulent.

I. "Binders" on life and health and accident insurance applications have been a fertile source of litigation. Anno. 2 A.L.R.2d 943. The leading case of Reynolds v. Northwestern Mutual Life Insurance Company, 189 Iowa 76, 176 N.W. 207 early established the Iowa law in this field. In that case we considered a conditional receipt similar to that set out above. We held: "[T]he contract became binding, and the insurance effective, on the date of the medical examination, subject, however, to the provisions of the company's regular form of policy for the plan applied for, and the insurability of the applicant on the date of such medical examination. The insurability of the applicant on the date of the medical examination is, by the contract, made the test of the company's liability.

"By the third clause of the contract, the company agrees, in case the application is rejected, to return the premium paid. Unless the application is, in the proper exercise of the company's rights, under the law and the contract, rejected, and the insurance refused, the preliminary contract provides protection from the date of the medical examination; and, if death results from some cause arising after the date of such examination, the company is liable upon the contract, according to its terms; but, if the company, in the proper exercise of its legal rights under the law and the contract * * * rejects the application, upon the ground that the applicant is not insurable, and returns the premium paid, no liability can arise thereunder." 189 Iowa at 81, 176 N.W. at 209.

The legal interpretation given such receipt in the Reynolds case provides a sound basis from which to proceed to the issues before us. See New England Mutual Life Ins. Co. of Boston, Mass. v. Hinkle, 8 Cir., 248 F.2d 879; Simpson v. Prudential Insurance Co. of America, 227 Md. 393, 177 A.2d 417, 423; Anno. 2 A.L.R.2d 943, 986; Comment, 44 Yale L.J., 1223, 1227, 1232.

II. Our problem here is more difficult than the one confronting the court in the Reynolds' case. There "insurability" was denied because of the applicant's physical condition at the time of his application. At the time of death, the company was still investigating his health. The death certificate revealed he was suffering from a heart condition which made him uninsurable. We held applicant uninsurable as a matter of law. 189 Iowa at 83, 176 N.W. at 210.

Here the claimed uninsurability is based on a nonmedical factor designated as a "moral hazard". An insurance company executive, as a witness, described moral hazard as follows:

"Generally, there are medical and non-medical considerations that must be taken into account before an application for life insurance can be approved. By non-medical is meant the purpose and need for the insurance; the total amount of insurance in force on a particular individual; his occupation, his residence; his participation in hazardous duties; sports, if any; his business and financial history; his marital history, to some degree; his personal habits, such as drinking habits, philandering and that type of thing. There are many others. The medical considerations are the applicant's current physical condition and his medical history.

" 'Moral hazard' means any personal habit or activity of the insured that would cause him to be something less than a standard risk for insurance. Both medical and non-medical considerations affect longevity. The existence of moral habits affect insurability. There are two basic sources of information used in appraising the non-medical aspects of an application, inspection service reports and the agent himself. There are other sources that can be referred to, if necessary.

"Generally speaking, a moral hazard case will be either rated up or deferred, declined or postponed. Witness was familiar with generally accepted underwriting standards and stated that an individual that is known to have shortages in his accounts at a bank where he was working would be rated as a moral hazard. This fact would affect his insurability in that it would cause his application to be deferred, declined or postponed."

"The weight of authority, which includes all the better-reasoned cases, seems to be to the effect that the term 'insurability' is broader than 'good health', * * *." Anno., 162 A.L.R. 668, 669. New England Mutual Life Ins. Co. of Boston, Mass. v. Hinkle, 8 Cir., 248 F.2d 879, 885–886 and citations; Kirby v. Prudential Ins. Co., 239 Mo.App. 476, 191 S.W.2d 379, 162 A.L.R. 660, 664–665; Gressler v. New York Life Ins. Co., 108 Utah 173, 156 P.2d 212, 214, modified on other grounds, 108 Utah 182, 163 P.2d 324, 164 A.L.R. 1047. See Warren v. New York Life Ins. Co., 5 Cir., 128 F.2d 671; Vargas v. Pacific National Life Assurance Company, 79 N.M. 152, 441 P.2d 50, 53, 55. There are cases which hold otherwise. Anno., 162 A.L.R. 668, 675.

■ We are of the opinion that if an insurance company conducted a good faith investigation of an applicant in the proper exercise of its right to determine insurability and thereby learned the applicant was involved in shortages and discrepancies in bank accounts under his supervision, it could properly reject the applicant as uninsurable.

The difficulty lies not with the principle but with its application to the facts. It is also essential to define "good faith investigation by the company in the proper exercise of its rights". Not only must the information disclosed be such that the com-

pany could reasonably conclude the applicant was a moral hazard, but the investigation which disclosed the fact must have been one conducted in good faith to determine insurability rather than to uncover facts to defeat liability. When death intervenes between the time the conditional receipt is given and the determination of insurability is made, there is an obvious temptation for the company to make an intensive after the fact investigation to discover reasonable grounds for finding the applicant uninsurable. It is against public policy to place the insurance company in a position to benefit by dragging skeletons from a dead man's closet, which would not come to light in the course of its ordinary routine investigation. If an intensive investigation after the death brings to light facts which would tend to prove fraud or suicide, such defense should be alleged. The company should not be permitted to use such information to attack insurability.

We are here limiting our discussion to moral hazards. We are not deciding the company's right to investigate an existing undisclosed physical condition or medical history which was related to the death to determine insurability.

As there are few cases involving uninsurability because of a moral hazard, we have been unable to find any direct authority for our position. The necessity for a good faith rejection of the application is well recognized in conditional receipt cases. Simpson v. Prudential Life Insurance Co. of America, 227 Md. 393, 177 A.2d 417, 424; New England Mutual Life Ins. Co. of Boston, Mass. v. Hinkle, 8 Cir., 248 F. 2d 879, 884; Anno., 2 A.L.R.2d 943, 986.

We find some support in United Founders Life Insurance Company v. Carey, Tex., 363 S.W.2d 236, 243, the applicant died while the company was in the process of investigating his physical condition. After the death, the company rejected the application on medical grounds without completing the medical investigation or forming an opinion. The court said: "They could not defeat his right to tempo-

rary insurance by arbitrarily refusing to proceed to the formation of an opinion after his death. We have also stated that an opinion that he was not insurable and acceptable could not be reached arbitrarily because of his death but that it must have been reached in good faith. Petitioner was certainly entitled to make any reasonable investigation as a basis for reaching a good faith opinion."

In Vargas v. Pacific National Life Assurance Company, 79 N.M. 152, 441 P.2d 50, 53, a credit report completed after the death of the applicant from carbon monoxide poisoning revealed drinking habits which made him uninsurable. The trial court found "this determination was made in good faith in accordance with the appellees rules and regulations, and was not influenced by the fact that the applicant had died".

For the reasons set out above we hold that a good faith investigation within the proper exercise of the company's rights is limited to that which would be conducted by the company in the course of its ordinary routine investigation uninfluenced by *the intervening death of the applicant.* Only information which would have become available as a result of such investigation may be used in determining insurability.

III. With this principle in mind we turn to the evidence to determine (1) *whether the evidence establishes that applicant was a moral hazard* and (2) whether the information disclosed by the investigation may properly be used to determine insurability.

Paul D. Pedersen was born and raised on a farm in Cherokee County. He was employed as a teller in the Central Trust & Savings Bank, Cherokee, Iowa at the time of his marriage to plaintiff in 1960. Decedent was promoted to assistant cashier and continued in that capacity until January 31, 1967 when he voluntarily terminated his employment to accept a better paying position with the Solon State Bank.

While employed with Central Trust & Savings he handled the Credit Life Insurance Program within the bank. Decedent also clerked farm sales as one member of a two man team which recorded, collected, and accounted for the proceeds of the sales.

At the time of his death on March 17, 1967, he was in good health, enjoyed hunting, fishing, and athletics, was a cautious automobile driver, did not smoke or drink excessively, and his general reputation in both communities for morals was good. He made friends easily, was liked by his employers, loved his children and enjoyed a happy marriage. The credit reports on decedent were all good.

In January 1967 Pedersen's wife and his co-worker, James Keeline, noticed he was unusually nervous. His wife felt he was worrying about telling his employer he was resigning after seven years with the bank. During the month decedent obtained a loan of $5000 from General Acceptance Corporation Executive Services. His wife did not know what the proceeds were used for. On January 31, 1967 he left Cherokee to take up his new job.

Pedersen had been treasurer of March of Dimes. In February 1967 this account in Central Trust and Savings was not large enough to cover a check for $150. Mr. De Haan, a fellow bank employee, called Pedersen and told him they needed funds. He understood Pedersen kept a separate account. Pedersen had told him it was at Aurelia. Pedersen also handled funds for the Modern Woodmen of America.

On February 20 Pedersen came to Cherokee and handled the following transactions himself. He presented a check from Executive Services, the finance company, in the amount of $2266 which was disbursed as follows: deposit to March of Dimes, $498.90; deposit to Modern Woodmen of America, $270; deposit to Paul D. Pedersen's personal account, $230; paid his note #48362 with interest; made a payment on his real estate loan; paid $300

principal and $2.17 interest on another personal note; took the difference in cash in amount of $642.53. The March of Dimes deposit was marked "Aurelia Draft", which was not correct.

On February 24, attorney for the Schmillen estate, which Pedersen had helped clerk and which account he had handled, conferred with bank employees about the account because the clerk's record did not balance with the deposit Pedersen made. De Haan called Pedersen about this discrepenacy. He again called Pedersen on March 8 about the Schmillen sale. Pedersen said they should balance. After the bank closed De Haan and a co-worker checked a micro film which showed deposits were made directly to Pedersen's account from the receipts of the Schmillen sale. On March 9, Mr. Keeline, president of the bank who had been absent from the bank since the latter part of January returned and was advised of the problems in the Schmillen farm sale. He called Pedersen March 10 asking him to come help them straighten out these problems. Pedersen said he would come up Monday, March 13.

On March 13 Pedersen called and said the bank examiners were at Solon and he was unable to leave. On the same date he sent a bank money order in the amount of $590 to the attorney for the Schmillen estate accompanied by the following letter.

"Enclosed you will find a check in the amount of $590 which represents the balance due on the hogs purchased of Benson's on the Schmillen Sale. The bank called me about the difference on the sale so it started me thinking about it. I finally thought about the hogs as the above amount was withheld until we could get the vacination papers on the hogs.

"I did some checking on it Saturday and found out that this amount had not been paid. The check was forwarded to me today in error so I am returning this amount to you.

"I am sorry about the problems that this error on my part has caused."

On March 14 the attorney informed the bank that the money order had been received. Keeline called Pedersen who stated the Schmillen sale had been taken care of. Pedersen was asked to come up Saturday the 18th "as there were other things that needed explaining". Pedersen said he would try to be in Cherokee that date.

On the same date he completed an application for $25,000 life insurance with double indemnity for accidental death, passed the medical examination, submitted the premium payment and wrote out the conditional premium receipt heretofore set out.

On March 15 and 16 Pedersen was home with the flu. On the 16th Jack Spaulding defendant's general agent and decedent's close friend visited him at home. Pedersen mentioned he had just bought some additional insurance to replace part of the group coverage he lost when he left employment in Cherokee. Spaulding testified: "I again told him at that time that his insurance would be in force as soon as he took his physical examination. He said that he had already taken his physical and I then said to him that his insurance was now in force if the results of the physical examination were satisfactory."

The company received the application at its home office and started routine processing which ordinarily takes 10 days to two weeks. Policies of this size must be reinsured.

On March 17 at 7:45 a. m. as Pedersen was on his way to work by himself his Volkswagon struck a bridge abutment and he was killed. Pedersen's neighbor called Spaulding before 9:00 a. m. He received the call when he was having coffee with Mr. Keeline in the bank. At that time Mr. Keeline advised Spaulding there were some shortages in some accounts at the bank supervised by Pedersen. This was Spauld-

ing's first knowledge of this situation. He helped two evenings on the subsequent audit.

On March 21, Spaulding informed the agency supervisor of the shortages in Pedersen's accounts.

On March 22, the company stopped processing Pedersen's application.

On March 24, the president of the company visited about the situation at the bank with Mr. Keeline.

On March 30, Mrs. Pedersen was appointed administratrix.

On April 3, the company denied liability and refunded the premium.

This law suit was started thereafter.

The evidence also disclosed that Pedersen, except when he was on vacation or ill, was in charge of the Central Insurance Agency account from 1963 until he left the bank January 31, 1967. This account was used as a depository for credit life insurance premiums on customer's loans. Except for the few who wanted to write checks for the premiums, Mr. Pedersen debited the borrower's checking account for the premium, which was deposited in the Central Insurance Agency account. A commission of 25% was retained and a check written on that account for the premium remitted to the company. Evidence showed in January 1967 debits were made to certain accounts but the credits were: $45 to Pedersen's account, $200 principal and $11.04 interest on Pedersen's note and cash out of $10.48. The monthly report and a check for that month's premiums on the Central Insurance Agency account were prepared and signed by Pedersen. Subsequent audit disclosed shortages in this account between 1963 and the time Pedersen left the bank exceeded $14,000. Pedersen left the bank January 31, 1967. The last two shortages occurred on Febru-

ary 1, 1967 ($113) and February 2 ($37). An asterisk on the bank's exhibit stated: "We feel that these last two entries were made the last day of January."

The audit also disclosed shortages in several farm sales besides the Schmillen sale at which Pedersen had served as one of two clerks. The bank's bonding company reimbursed the bank for these shortages and the shortages in the insurance account in a total sum exceeding $17,000.

■ It is our conclusion under this record that Mr. Pedersen was responsible for the shortages and discrepancies which appeared in the accounts under his supervision, even though about six other employees had access to them. The transactions which created the shortages are too closely tied to Mr. Pedersen's activities to permit any other conclusion. These facts would justify an insurance company in turning down an application for insurance on the ground the applicant was a moral hazard.

IV. However, this does not supply the answer to our problem here. Under the principle announced in division II we must determine whether the information disclosed above was obtained as a result of the company's routine investigation uninfluenced by the intervening death of the applicant. The company's investigation did not reveal the applicant's possible involvement in bank shortages. His reputation was excellent as was his credit report. Even the credit report submitted after the accident failed to disclose any thing adverse to applicant.

The insurance company embarked on its investigation as a result of the comment by the banker to Spaulding, its general agent and deceased's close friend, immediately after Pedersen's death. We are convinced this investigation would not have been conducted nor the information revealed except for the death of the applicant. We are persuaded the application would have continued on toward its routine approval ex-

cept for the unfortunate automobile accident.

In this connection it may be proper to mention that overshadowing the whole record is the suspicion of suicide—the insinuation that deceased took his own life. Suicide was not pleaded as a defense to the policy. In fact, the pleadings admit the death was accidental.

The company should plead such issue if it believes it to be an element in the case and not attempt to take advantage of such insinuation in an argument on insurability.

■ We, therefore, hold the information obtained by the insurance company justifying a decision that the applicant was a moral hazard and, as such, not insurable was not obtained in a good faith investigation of insurability. It was disclosed because of his death and used by the company in an attempt to escape liability under a policy which would, except for his death, have been issued routinely.

V. The insurance company claims the court erred in finding defendant failed to show by clear, satisfactory and convincing evidence that the representations made by Pedersen on the application for insurance were false and fraudulent. The representation in question was contained in the agent's certificate. As Pedersen was the agent as well as the applicant, he completed the form which contained this question:

"5. Do you know of anything unfavorable regarding the Proposed Insured's health, character, reputation, habits, hobbies, police records, etc., that might affect insurability? If yes, give full details." This was answered in the negative.

It was our conclusion in division III that Pedersen was responsible for shortages in bank accounts under his supervision and that such situation was related to his insurability. It follows that Pedersen as agent knew such factor affected his insurability and did not answer truthfully when he answered in the negative.

The specific question for our determination here is the duty of an insurance agent to his company when he is writing an application for insurance on his own life. The law seems well settled.

■ "It is the settled rule of law that an agent cannot represent both himself and his employer in transactions where their interests are adverse. [Citing cases]" Clapp v. Wallace, 221 Iowa 672, 676, 266 N.W. 493, 495.

"The position of a life insurance agent taking out a policy in the company on his own life required that he act in good faith in the observance of the company's rules and regulations relating to the delivery of policies. While procuring insurance for himself, the agent does not act as the agent of the insurer but on his own behalf. And any agent having an interest adverse to the insurer must disclose such interest, or the policy is unenforceable." 16 Appleman Insurance Law and Practice 321, section 8737.

"An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them." 2 Restatement of Agency 2d 208, section 390.

■ "As between [an insurance agent] * * * and the company his acts will not be binding where they are in his own interest and contrary to the interest of the company for which he had attempted to act, and, unless he acts with the knowledge and consent of the company, he cannot bind it by issuing or securing a policy to himself or in which he is personally interested; * * *." 44 C.J.S. 829 Insurance § 156, p. 829.

In Schrader v. Prudential Insurance Co. of America, 5 Cir., 280 F.2d 355, an agent wrote insurance on his own life and withheld information relating to his condition of health. The court said: "Applicants who are strangers to an insurance company are bound to exercise good faith in answering questions on an application. * * An insurance agent writing insurance on himself is held to higher standards." 280 F.2d at 362.

"An insurance agent is under a duty to exercise good faith and loyalty toward his company, to make full disclosure to the company, and to obey instructions. This duty is increased, not diminished, when the agent becomes an applicant for insurance." 280 F.2d at 363. See also: Ingram v. Fidelity-Phoenix Fire Ins. Co., 10 Cir., 16 F. 2d 251, 252; McDaniel v. United Ben. Life Ins. Co., 5 Cir., 117 F.2d 339; Crumpton v. Pilgrim Health & Life Ins. Co., 35 Ala. App. 363, 46 So.2d 848, 851; Aetna Life Ins. Co. v. Routon, 207 Ark. 132, 179 S.W. 2d 862, 863; Muncey v. Security Ins. Co., 43 Idaho 441, 252 P. 870, 871; Martinek v. Fireman's Insurance Co., 247 Mich. 188, 225 N.W. 527, 528; Powell v. North State Mutual Life Ins. Co., 153 N.C. 124, 69 S.E. 12; Frazier v. Hartford Fire Ins. Co., 51 S.D. 40, 211 N.W. 973, 976; Rockford Life Ins. Co. v. Tschiedel (Tex.Civ.App.), 61 S.W.2d 536, 538.

■ Under these principles and in light of our finding in division III that Mr. Pedersen was responsible for the shortages and discrepancies in certain accounts under his supervision, we are compelled to hold he failed to make a full good faith disclosure of facts which he knew or should have known would reasonably affect his principal's judgment in passing upon his application for life insurance. Failure to do so amounts to a fraud upon the principal and makes the policy unenforceable.

■ VI. Appellee contends the trial court should be affirmed because the company had actually or constructively approved decedent's application for insurance. We cannot agree. The application was being handled in the usual manner.

The investigation had not been completed or the approval of the reinsurer obtained when the processing was stopped after applicant's death. We find insufficient evidence of approval.

For the reason stated in division V, the trial court is reversed.

Reversed.

All Justices concur except BECKER, J., who takes no part.