The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Plaintiff-Appellant,

v.

George ROBITAILLE, Defendant-Appellee.

No. 586, Docket 73-2312.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1974.

Decided April 4, 1974.

Bruce W. Manternach, Hartford, Conn. (Jack S. Kennedy, Robinson, Robinson & Cole, Hartford, Conn., on the brief), for plaintiff-appellant.

Morton C. Hansen, Jr., Hartford, Conn. (Fauliso, Katz & Hansen, Hartford, Conn., on the brief), for defendant-appellee.

Before KAUFMAN, Chief Judge, and FEINBERG and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

For the private citizen engaged in litigation, the outcome of his lawsuit may profoundly influence the future course of his life whether the issues presented raise questions of constitutional stature and great moment to the Republic, or merely rules of law that allow of limited application and arouse slight jurisprudential interest. In this appeal we consider a single, narrow question of Massachusetts law which will determine whether Guardian Life Insurance Co. (Guardian) can avoid its obligations under four policies issued to Dr. George Robitaille who, subsequent to the issuance of the policies, was diagnosed as having multiple sclerosis. Following a jury trial, Chief Judge Blumenfeld entered judgment for Dr. Robitaille. After careful scrutiny of the facts and the relevant state law, we affirm.

I.

Since a clear understanding of the complex and technical facts is essential to the determination of this appeal, we turn first to the events preceding the litigation. Dr. Robitaille had entered active service as a medical officer in the United States Navy immediately upon his graduation in 1960 from the Tufts University Medical School. According to his testimony at trial, Dr. Robitaille applied for discharge in 1968 but, because of the ongoing hostilities in Vietnam, his application was denied. In 1969, anxious to return to civilian life and to commence the private practice of medicine in Fall River, Massachusetts, he again requested a discharge, and this time his resignation from the service was accepted.

After a complete medical examination by Navy physicians, the doctor was declared in sound health. Accordingly, just prior to his discharge, Dr. Robitaille signed a statement releasing the Navy from responsibility for any medical problems which might develop subsequently. In anticipation of his departure from the service, and on the advice of a local agent for Guardian, Dr. Robitaille purchased four insurance policies:

1. Life Insurance Policy No. 2147543, Face Amount $50,000, with a provision for waiver of premium in the event of total disability, issued July 29, 1969.

2. Disability Income Policy No. G165503, monthly benefit of $800 for total disability, payable for lifetime of the insured, issued August 15, 1969.

3. Disability Income Policy No. G165473, monthly benefit of $800 for five years for total disability, with an additional monthly hospital benefit of $400 and accidental death benefit of $1,000, issued August 15, 1969.

4. Professional Overhead Expense Disability Policy No. G164897, monthly benefit of $600 for 12 months, issued June 12, 1969.

In connection with these policies, Dr. Robitaille, who was 34 years old at the time, executed and signed an application, dated June 17, 1969,[1] in which he an-

---

1. Although Guardian's complaint alleges that it was induced by Dr. Robitaille's application to issue all four policies, we note that the Professional Overhead Expense Disability

swered questions concerning his medical history. The following questions evoked responses which are at issue in this lawsuit:

8. To the best of your knowledge and belief, have you ever had or been told that you had: (a) a mental or emotional problem requiring the help of a physician or clinical psychologist, dizziness, fainting spells, epilepsy, convulsions, nervous breakdown, recurrent headaches, stroke, or any other disease or disorder of the brain or nervous system?

No.

(e) nephritis, kidney stone, or any disease of the kidneys, bladder, prostate, genital organs, or venereal disease?

Yes. Mild prostatitis in 1967. Treated by Dr. William Urschel, Chief of Urology, Naval Hospital, Newport, R. I. No recurrence since 1967.

(i) anemia, varicose veins or ulcers, phlebitis, disorder of blood?

Yes. Mild saphenous varicosities L leg. No symptoms.

(j) impairment of sight or hearing or any disease or disorder of the skin, ears, eyes, nose or throat?

Yes. Slight bilateral high tone hearing loss secondary to acoustic trauma (gunfire) in Navy 1961. No difficulty, no change in audiograms since then.[2]

9. Have you had an X-ray, electrocardiogram, blood studies, or other diagnostic test within the past five years?

Yes, as a matter of routine. All normal. Naval Hosp., Newport, R. I.

13. In the past 5 years have you consulted or been treated or examined by any physician or practitioner

(a) not named above?

No.

or (b) for any cause not recorded above?

No.

In his application, Dr. Robitaille specifically authorized Guardian to examine all his medical records, a privilege which Guardian failed to exercise. On July 8, 1969, Dr. Robitaille was examined by Dr. David Greer, a medical examiner for Guardian, who indicated he was a "first class" candidate for insurance. Accordingly, the policies were issued.

Dr. Robitaille's honorable discharge from the Navy became effective July 1, 1969. Believing himself to be in good health, he immediately proceeded to carry out his intention to establish a private practice in Fall River, Massachusetts, an endeavor which incurred the not inconsiderable expenses of renting and staffing a medical office. His career as a private practitioner was, however, short-lived. Several months after his discharge, Dr. Robitaille developed a burning sensation (paresthesias) in both legs. His condition worsened and, when he developed a weakness of the right leg, he was "no longer able to carry on." On November 17, 1969, he entered Massachusetts General Hospital for extensive tests [3] which produced for the first time a diagnosis of multiple sclerosis, a tragic degenerative disease of the nervous system. Following his release from the hospital on December 2, he abandoned his new practice and, in order to pursue a less demanding career, joined the staff of St. Mary's Hospital in Waterbury, Connecticut as a hematologist.

Policy was issued on June 12, five days before the date on the application. This seeming anomaly was not explored at trial and no ready explanation emerges from the record.

2. Although not set forth in the application, Dr. Robitaille did experience some blurring of vision in 1968. This fact, however, was

communicated to Guardian's medical examiner Dr. Greer, who noted Dr. Robitaille's diagnosis of congenital inclusions in his right eye.

3. The precise nature of these tests is not disclosed in the record.

The diagnosis of multiple sclerosis not only had a dramatic impact on Dr. Robitaille's future, it also provided a basis for the perfect hindsight with which to view his past medical history. Such 20/20 hindsight is common when a final diagnosis, even one which had evaded the best medical brains, is made. But, the process of diagnosing disease is not unlike that of fitting together a jigsaw puzzle—seemingly disjointed pieces are suddenly placed in proper juxtaposition only after the critical connection is supplied. Accordingly, after Dr. Robitaille left Massachusetts General Hospital it became possible to surmise that several symptoms he had exhibited prior to his discharge from the military—symptoms which had been associated by his Navy doctors merely with the ailments revealed in his insurance application— might, now that everyone was wiser, really have been early indications of neurological disorder.

A brief recitation of the history of his symptoms is in order.[4] In early June 1968, Dr. Robitaille experienced some dizziness (positional vertigo) and oscillations of the eyeball (nystagmus) which were attributed by Dr. E. J. Sacks, a Navy otorhinolaryngologist, to the acoustic trauma Dr. Robitaille suffered in 1961. Apparently no treatment was prescribed and these symptoms disappeared completely by the end of July 1968. In October 1968, Dr. Robitaille noticed a blurring of vision in his right eye which Dr. Dunbar Hoskins, a Navy ophthalmologist, examined and believed to be caused by congenital nuclear cataracts. Dr. Robitaille disclosed this finding to Guardian's medical examiner, Dr. Greer, but the condition was subsequently recognized at Massachusetts General

as a scotoma, or isolated area of depressed vision.[5] According to uncontradicted testimony at trial, a scotoma does not necessarily impair vision and, indeed, Dr. Robitaille's vision remained 20/20.

Finally, in early 1969, Dr. Robitaille experienced a "vague sensory disturbance" in his right leg and a numbness in his hands, which he mentioned to Dr. T. A. Grossi during his annual naval physical in April. The numbness was described as a "pins and needles" sensation which Dr. Grossi attributed to Dr. Robitaille's habit of leaning his elbows on his desk as he worked. In addition, Dr. Grossi conducted a complete neurological examination and found no abnormality.

Despite the transitory nature of these symptoms, when Dr. Robitaille traveled to Chelsea Naval Hospital in Boston on official business in April 1969 he described his physical findings to Dr. Leland Patterson, a neurologist. During their casual conversation, Dr. Robitaille asked whether his symptoms could be associated with any neurological disease or multiple sclerosis. Dr. Patterson conducted an unofficial neurological examination (not reported in Navy records) which proved negative, as had Dr. Grossi's several days earlier. Accordingly, Dr. Patterson found, and informed Dr. Robitaille in emphatic terms, that he did *not* have any neurological disorder.

We observe therefore, a background of unequivocal assurances that no neurological abnormalities were present, and consistent medical opinions that his symptoms were related to the prostatitis and acoustic trauma. Nevertheless, when multiple sclerosis was subsequently diag-

4. In addition to the symptoms related above, Guardian claimed that Dr. Robitaille should have disclosed further information concerning his prostatitis, specifically, a complete urinary retention and the utilization of a cystoscopic diagnostic test. These items are discussed in greater detail below.

5. There was considerable disagreement at trial concerning the likely origin of the sco-

toma. Guardian's witnesses testified that scotoma is evidence of optic neuritis, although they could not state that this was true in Dr. Robitaille's case. Dr. Robitaille testified, on the contrary, that scotoma is not necessarily of neurological origin and that, in fact, there had never been a definitive connection made between his scotoma and any neurological disorder.

nosed and Dr. Robitaille was unable to continue his private practice, Guardian sought to avoid liability under the policies because of alleged material misrepresentations in the application, a ground not infrequently asserted when the insurer faces substantial liability. Accordingly, Guardian brought this action to rescind the four policies and to enjoin Dr. Robitaille from making claims for payment.

In its complaint, Guardian contended that Dr. Robitaille's failure to disclose his symptoms when he applied for the policies constituted material misrepresentations which increased the insurer's risk of loss. In his defense to this suit, Dr. Robitaille claimed that his responses on the application adverted to all disorders which had been diagnosed and for which he had received treatment. He urged, moreover, that in light of the disclosure of all his diagnoses (prostatitis, acoustic trauma, optic inclusions) his failure to specify all symptoms underlying those diagnoses did not misrepresent the status of his health—in fact it was because of the assurances of good health that he entered private practice, incurring the concomitant expenses that flow from opening a doctor's office. In any event, Robitaille also asserted that he had given Guardian complete access to his medical records and, upon simple inquiry at Newport Hospital, it could have ascertained his symptoms. Above all, he claimed that the presence of multiple

sclerosis, which was not detected until months later could not have been communicated to Guardian in June or July 1969.

After a two-day trial, Judge Blumenfeld, without objection by counsel for Guardian, submitted a single interrogatory to the jury which, after deliberating for only 20 minutes, returned with a response favorable to Dr. Robitaille. Guardian then moved for judgment notwithstanding the verdict and, after denying that motion, Judge Blumenfeld entered judgment for Robitaille.

## II.

Federal jurisdiction in this case derives exclusively from the parties' diversity of citizenship.[6] 28 U.S.C. § 1332. Judge Blumenfeld found, and the parties agreed, that Massachusetts substantive law governs the case.[7] Accordingly, we turn now to the relevant Massachusetts statute, Mass.Gen.Laws Ann. c. 175 § 186, which provides:

No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

6. Guardian is a New York corporation having its principal place of business in New York. At the time the action was commenced, Dr. Robitaille was a citizen of Connecticut. The amount in controversy exceeded $10,000.

7. Robitaille applied for the policies in dispute through Guardian's agent in Fall River, Massachusetts. They were prepared and mailed by Guardian in New York. There is no disagreement that the policies were delivered, as specified in the application, to Dr. Robitaille's office address in Massachusetts. In determining the appropriate state substantive law to be applied to the action, Judge Blumenfeld properly followed the conflicts of law rules prevailing in the state in which he sat—Connecticut. See Klaxon Co.

v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Connecticut rule seems to be that the law of the jurisdiction where the contract was entered into will control unless the contract is to have its operative effect or place of performance in another jurisdiction, in which case the law of the place of operative effect governs. See Breen v. Aetna Cas. & Sur. Co., 153 Conn. 633, 220 A.2d 254, 256–257 (1966); Jenkins v. Indemnity Ins. Co., 152 Conn. 249, 253, 205 A.2d 780, 782–783 (1964). Since the policies were apparently to have their operative effect in Massachusetts where Robitaille maintained his office, it was agreed that Massachusetts law would control the case.

In applying the statutory standard tb the circumstances of this case, we note at the outset that Guardian expressly disavowed any intention to prove that Robitaille acted deceitfully. Guardian's disclaimer of liability, therefore, rested entirely on the "increased risk of loss" provision of § 186. Accordingly, we must look to the longstanding line of Massachusetts cases which make abundantly clear that the question whether misstatements in the application increased the risk of loss is, virtually in every instance, one of fact for the jury. *See e. g.,* Davidson v. Massachusetts Cas. Ins. Co., 325 Mass. 115, 89 N.E.2d 201, 204 (1949); Schiller v. Metropolitan Life Ins. Co., 295 Mass. 169, 3 N.E.2d 384, 388 (1936); Smardon v. Metropolitan Life Ins. Co., 243 Mass. 599, 137 N.E. 742, 744 (1923); Coughlin v. Metropolitan Life Ins. Co., 189 Mass. 538, 76 N.E. 192 (1905); Levie v. Metropolitan Life Ins. Co., 163 Mass. 117, 39 N.E. 792, 793 (1895). Moreover, it is a factual question on which the insurer must bear the burden of proof. *See, e. g.,* Davidson v. Massachusetts Cas. Ins. Co., *supra,* 89 N.E.2d at 204; McDonough v. Metropolitan Life Ins. Co., 228 Mass. 450, 117 N.E. 836, 837 (1917).

At the trial, Guardian attempted to sustain its burden by offering the testimony of Dr. Phillips Lambkin, Guardian's Medical Director, and Dr. D. Sergeant Pepper, who had served in a similar capacity for several other insurance companies. Guardian's witnesses testified that knowledge of the symptoms and diagnostic tests omitted from Dr. Robitaille's application was essential to the underwriters who approved the issuance of the policies. In addition, they contended that the numbness, dizziness, nystagmus, and scotoma were potentially related to multiple sclerosis and, therefore, should have been disclosed. Finally, Guardian relied on a statement Dr. Robitaille submitted to the Naval Board of Record Corrections on December 24, 1969, *after* his multiple sclerosis had been diagnosed. There he recounted the same symptoms he had discussed previously with Navy doctors and concluded that, upon learning of a firm and conclusive diagnosis of multiple sclerosis, retrospection [8] led him to the belief that a connection might have existed between his newly diagnosed condition and the earlier symptoms which had been attributed by all examining doctors to other, less debilitating, conditions.[9]

Robitaille, on the other hand, asserted at trial that when he completed the application he had an honest belief that it would be more useful to the company if he were to reveal the actual diagnoses of physicians, rather than for him to itemize the various symptoms and tests upon which the diagnoses were grounded. We note, moreover, that on cross-examination even Dr. Lambkin made the telling concession that it was "logical" for a doctor to respond to an application for insurance in that fashion. His premise

---

8. The distinction between present and retrospective knowledge, which is expressed in Dr. Robitaille's letter of December 24, 1969, is indispensable to a determination of this case. Our dissenting brother obscures this distinction when he suggests that Dr. Robitaille admitted at trial that his responses on the application were incomplete. The record is clear that he made no such concession. Dr. Robitaille testified simply that the answers he furnished in the application for insurance in June 1969, were medically sound. Upon retrospection, however, he like any mortal, recognized that when the verdict on his diagnosis was finally rendered in December 1969, symptoms which all, including the best medical brains, believed unimportant in June 1969 might have had significance. But, contrary to the contention in the dissenting opinion, Dr. Robitaille never conceded that the statements on the application misrepresented the state of his health in June 1969, and he insisted that as then viewed by the doctors who examined him, he was in good health with no indication of neurological abnormality.

9. Subsequently, the Naval Board of Record Corrections changed Dr. Robitaille's discharge from "honorable" to "medical" and awarded him a 30% disability pension. The record does not indicate, however, the standard by which the Naval Board made its determination nor does it illuminate the precise basis for the Board's action.

undoubtedly was that the revelation of a diagnosis of disease would necessarily imply to those examining the application that specific symptoms existed and that appropriate tests had been conducted before diagnosis.

## III.

■ Turning now from our general discussion of the positions taken by the parties to the specific facts before us, we note that in the course of his testimony Dr. Robitaille responded clearly to each alleged misrepresentation. Concerning his negative response to question 8a, he stated that the wording of the application form ("dizziness . . . or *any other disease or disorder of the brain or nervous system*" (emphasis added)) required an affirmative answer only if his physical condition rose to the level of a disease of the nervous system.[10] Since both he and Dr. Sacks viewed his dizziness, or vertigo, and nystagmus as byproducts of the acoustic trauma listed in response to question 8j rather than as neurological disorders, he believed his response to 8a did not require explication. In addition, the numbness in his hands, which Guardian contended may have been neurologically related, was dismissed by Dr. Grossi, after thorough examination, as a common complaint of desk-workers who habitually lean on their elbows, and certainly not noteworthy. Moreover, Dr. Robitaille testified that the particular type of vertigo he experienced (positional) is not typical of multiple sclerosis.

Dr. Robitaille believed also that his response to question 8e, which candidly set forth his mild prostatitis and treatment by Dr. William Urschel, was sufficient. Guardian argued, however, that the doctor should have disclosed that the diagnosis was based on a reduction in force in his urinary stream which culminated in a complete urinary retention on December 7, 1967. But, at the time the retention occurred, Dr. Urschel had performed a cystoscopy (described at trial as a not uncommon diagnostic procedure for determining the cause of prostatitis) and the condition subsided.[11]

Dr. Robitaille also rebutted the insurer's attacks against his response to question 9, that other diagnostic tests were "routine" and their results "normal." Guardian claimed that the doctor should have disclosed the cystoscopy, a urinalysis and glucose tolerance test in connection with the prostatitis; the examinations with regard to the vertigo and nystagmus; and neurological examinations concerning the numbness in his hands. To this claim, Dr. Robitaille reiterated his position that all the tests Guardian cites were either conducted as part of the examinations leading to the specific diagnoses clearly listed on the application or resulted in findings of "no abnormality." Accordingly, in light of Dr. Robitaille's disclosure of all relevant diagnoses and his consent to an examination of the records at Newport Hospital, one must ask whether he nevertheless was under a duty to furnish additional details to Guardian.[12]

10. Under Massachusetts law, any ambiguity in the question is to be construed against the insurer. Shaw v. Commercial Ins. Co., 270 N.E.2d 817, 821 (Mass.Sup.Jud.Ct.1971).

11. In his statement to the Naval Board of Record Corrections, Dr. Robitaille indicated that some hesitancy in urination remained, but testified at trial that this is a fairly common psychological reaction among patients who have suffered from prostatitis and who are, accordingly, overly conscious of this excretory process. Moreover, Dr. Robitaille testified unequivocally, and without contradiction, that there was no recurrence of urinary retention after December 1967.

12. The notion that question 9, despite its absolute language, did not in fact require disclosure of *all* diagnostic tests is buttressed by evidence introduced through witnesses for the insurer. In particular, Dr. Lambkin, Guardian's medical director, testified that an applicant would not be expected to itemize each X-ray he had undergone during a five-year period. This testimony deviates from the precise language of the application form and suggests that latitude for interpretation exists.

Among the most disputed of Dr. Robitaille's responses was his use of the term "routine" in answer to question 9 to describe his diagnostic tests. Guardian

Finally, Robitaille explained his response to question 13 that, in the five previous years, he had not consulted any physicians other than those listed. The doctor testified at the trial that during his years in the service he did not have a personal physician, but, as is customary in the military, saw various doctors for his annual physical examinations and for specific complaints. Since he did not consult any non-military doctors, all his records were compiled and readily accessible at Newport Naval Hospital.[13] Having listed the hospital and having authorized Guardian to examine his files, he did not believe it necessary to enumerate the names of the Navy doctors which were fully recited in the Newport records.

### IV.

Having failed to sustain its burden of proof to the jury's satisfaction, and despite the obviously complex factual questions presented, Guardian now contends that it is entitled, as a matter of law, to judgment in its favor. For this position, Guardian relies on a few cases which have deviated from the well established Massachusetts rule that the question whether risk of loss was increased is one to be determined by the jury. Our exhaustive study of the relevant Massachusetts case law, however, compels the conclusion that this is not one of those aberrant cases which Massachusetts has narrowly circumscribed, in which the jury's verdict can be lightly overturned. We believe, therefore, that Judge Blumenfeld was entirely correct in entering judgment for Dr. Robitaille.

In every case cited by Guardian for its position that the verdict should have been upset, the insured party had a grave and debilitating disease which had been discovered prior to the application for insurance.[14] *See, e. g.,* Pahigian v. Manufacturers' Life Ins. Co., 349 Mass. 78, 206 N.E.2d 660 (1965) (Hodgkin's disease); Brown v. Greenfield Life Ass'n., 172 Mass. 498, 53 N.E. 129 (1899) ("consumption"); Rainger v. Boston Mut. Life Ass'n., 167 Mass. 109, 44 N.E. 1088 (1896) (alcoholism).

claimed it was misled into believing the tests described as "routine" were similar to those administered as a matter of course during annual physical examinations. Complete neurological tests and a cystoscopy conducted in response to specific medical complaints would, under Guardian's definition, not be routine. But, Robitaille testified in his defense that he considered the diagnostic tests routine procedures for his particular disorders (prostatitis and acoustic trauma). Even if Dr. Robitaille's response could be deemed a misrepresentation of his medical history as a matter of law, the question whether that misrepresentation increased the risk of loss would still remain one for the trier of fact. *See* Rappe v. Metropolitan Life Ins. Co., 322 Mass. 438, 77 N.E.2d 641 (1948); Hogan v. Metropolitan Ins. Co., 164 Mass. 448, 41 N.E. 663, 664 (concession that insured suffered from "kidney *trouble*" did not contradict, as matter of law, response on application denying "kidney *disease*"). *Cf.* Smardon v. Metropolitan Life Ins. Co., *supra,* 137 N.E. at 744; Gianelli v. Metropolitan Life Ins. Co., 307 Mass. 18, 29 N.E.2d 124, 127. Guardian did not ask the Court to instruct the jury that some of Dr. Robitaille's representations were false nor did it object to the charge given and it does not attack the charge on appeal.

13. It was conceded that the neurological examination conducted by Dr. Patterson was not reported in Dr. Robitaille's files at Newport Naval Hospital. That examination, however, as noted above, resulted in a finding of no abnormality and in an emphatic assurance to Dr. Robitaille that he did not have a neurological disorder.

14. In Dolan v. Mutual Reserve Fund Life Ass'n., 173 Mass. 197, 53 N.E. 398 (1899), it was held that increased risk of loss could be found as a matter of law where the insured had understated his age in an application for a life-term policy (the case was remanded for new trial on the question whether the age was actually misstated). But, the Court in *Dolan* did not announce a *per se* rule that understatement of age was material in all insurance applications. Accordingly, in Coughlin v. Metropolitan Life Ins. Co., 189 Mass. 538, 76 N.E. 192 (1905), the Supreme Judicial Court of Massachusetts reversed a directed verdict for the insurer, which had been based on *Dolan*, where, in an application for a twenty-year term endowment policy, the insured had understated his age by eight years. Whether the risk of loss was increased by the misstatement was deemed a question of fact.

Moreover, in each instance the evidence was clear that the insured was aware of his condition at the time he applied for insurance.

Guardian relies heavily on Lennon v. John Hancock Mut. Life Ins. Co., 339 Mass. 37, 157 N.E.2d 518 (1959), where the applicant for insurance stated he had not received any out of the ordinary medical treatment in the preceding five years, but one week after filing his application and before the policy issued, underwent an operation for throat cancer. Lennon did not inform the insurance company of this operation, claiming later that he was not aware the surgery was for cancer. Instead, he argued that he believed he was receiving a treatment for "hoarseness." In voiding the policy as a matter of law, the Supreme Judicial Court of Massachusetts held that even though ignorant of the reasons for which his doctor performed the operation, he had a duty to disclose a medical event as significant as surgery performed before the policy issued because the company, upon further investigation, could have discovered the diagnosis of cancer.

The case before us is clearly distinguishable. Dr. Robitaille was not found by his doctors to have multiple sclerosis until months after the policy had issued. The record indicates that while in the Navy he followed the prudent, and innocent, course of relating minor and transitory symptoms to his physicians—who were also his colleagues and with whom he was in daily contact—as soon as they appeared. He apparently followed the road of caution and, when fully assured of his sound health, acted in a manner consistent with the dictates of good faith. Indeed, he returned to civilian life to practice his profession of medicine in an office which he acquired and equipped. Not even a layman, no less a doctor, would have planned for such an active life with knowledge of a crippling disease lurking in his mind. In any event, as we have indicated, his application was not barren of medical information for he did disclose the prostatitis,

acoustic trauma, and visual inclusion which, the doctors believed, encompassed all the other symptoms Guardian claimed were concealed. We note that testimony at the trial, by the witnesses for Guardian as well as by Dr. Robitaille himself, indicated that these symptoms are not disease-specific to multiple sclerosis. Accordingly, there is no reason to believe —indeed, Guardian does not suggest— that even if the additional symptoms were disclosed, or if Guardian had investigated Robitaille's hospital records as he authorized them to do, the insurer would have diagnosed multiple sclerosis, obviously a disease which is extraordinarily difficult to detect and which all the doctors examining Robitaille failed to discover. There is not the slightest suggestion here that Robitaille was subjected to surgery, to incapacitating therapy, or to any other treatment of a character comparable to the serious operation in *Lennon*.

## V.

█ Guardian's argument, therefore, is reduced to the claim that Dr. Robitaille concealed information that increased its risk of loss as a matter of law, a claim which even our dissenting brother rejects. To be sure, the application was silent on the symptoms and tests subsumed under the diagnoses which were set forth. Under the standard enunciated in the Massachusetts statute, however, omissions or falsehoods will not void the policies unless they increased the insurer's risk of loss. We have noted that the amalgam of symptoms Robitaille failed to disclose is not the functional equivalent of multiple sclerosis. Accordingly, the question properly before us is not whether multiple sclerosis increases risk as a matter of law—a question which, in any event, would be one of first impression in a Massachusetts court—but whether dizziness, nystagmus, and cataracts do. When viewed in this light it is clear from the Massachusetts cases that Guardian's position is untenable. Not only is the instant case distinguishable

from the small number of Massachusetts cases which, without consistent reasoning, depart from that state's general rule that the question of increased risk is for the jury to decide, but closer examination suggests that those cases represent isolated, exceedingly rare and not favored exceptions to Massachusetts' oft-announced and firmly entrenched principle.

Several brief examples will illustrate Massachusetts' strong preference for submission of the risk question to the jury. In Levie v. Metropolitan Life Ins. Co., *supra,* the insured had suffered a strangulated hernia requiring the attendance of two doctors and an operation one year before he applied for insurance. His application contained a negative response to a question inquiring whether he had sustained any illnesses since childhood. The Supreme Judicial Court affirmed the trial judge's denial of a directed verdict in favor of the insurer: "Very probably it might make the life of the assured less readily insurable, but whether it did so was a question of fact." 39 N.E. at 793. Similarly, in Schiller v. Metropolitan Life Ins. Co., *supra,* where oral testimony and hospital records established that the insured suffered from coronary infarct, angina pectoris, sclerosis of the coronary artery, and coronary inclusion before and at the time he applied for insurance, the court held, "there was nothing which required a ruling of law that the risk of loss was thereby increased . . . . Although the evidence appeared very persuasive, the question ought not to have been taken from the jury." 3 N.E.2d at 388. The inelasticity of Massachusetts' rule that the trier of fact is to determine whether risk of loss was increased was reiterated with pristine clarity in Kaufman v. National Cas. Co., 342 Mass. 412, 174 N.E.2d 35, 38–39 (1961): "The trial judge could have found that the plaintiff [insured] had a heart attack before the issuance of the rider on the policy and that he gave no notice of this change of condition to the defendant [insurer] and still have found

that the plaintiff was possessed of no actual intent to deceive . . . and that the risk of loss to the defendant was not increased." *Accord,* Foss v. Mutual Life Ins. Co., 247 Mass. 10, 141 N.E. 498 (1923) (angina pectoris); Hogan v. Metropolitan Life Ins. Co., 164 Mass. 448, 41 N.E. 663 (1895) (kidney disease).

In view of the overwhelming weight of precedent, we cannot say that a state court in Massachusetts would have directed a verdict or granted judgment notwithstanding the verdict in favor of Guardian, the party required to carry the burden of proof. *See* H. Taylor, Life Insurance Law of Massachusetts, *supra,* 19 B.U.L.Rev. at 294–95. Indeed, our thorough reading of Massachusetts law convinces us, and our dissenting brother agrees, that the state courts would have decided without hesitation that the question whether Guardian's risk was increased was one for the jury to decide. It follows, therefore, that Judge Blumenfeld correctly rejected Guardian's attack on the verdict.

Verdicts in hard fought civil jury cases should be disturbed only under extraordinary circumstances. After all, the framers of our Constitution clearly reflected the important role of the jury in our system of justice. *See* U.S.Const. Amends. VI, VII. Indeed, the Supreme Court has cautioned appellate courts against tampering with jury verdicts:

> Though this case involves a medical issue, it is no exception to the admonition that, "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. . . . Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or

because judges feel that other results are more reasonable." Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.

Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 110, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959). *See* Jacob v. New York City, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942); O. W. Holmes, Jr., The Common Law, 127 (1881).

■ Dr. Robitaille's medical history was presented to the members of the jury in a detailed and exhaustive manner by live witnesses. The jurors, had the benefit of observing these witnesses and scrutinizing their conflicting testimony in the arena of the courtroom, fully aware of the proper legal standard which was to guide them, and which was incorporated in an interrogatory submitted to them without objection by Guardian: [15]

Do you find that the plaintiff has proved by a fair preponderance of the evidence that the defendant made or failed to make any statement in answer to questions in his application for insurance which increased the risk of loss under the policies?

Guardian's counsel described this interrogatory, to which the jurors responded in the negative, as "the whole issue completely." It was precisely that and Judge Blumenfeld properly refused to upset the verdict.

Affirmed.

MULLIGAN, Circuit Judge (dissenting):

Although I fully sympathize with Dr. George Robitaille, I am of the view that the verdict of the jury in his favor here is unconscionable and should be set aside.

15. It is ironic that the only objection to the charge was voiced by Robitaille's counsel who believed that Judge Blumenfeld's instructions unduly favored Guardian.

The dissent contains the novel suggestion that Guardian's clear acquiescence in Judge Blumenfeld's charge somehow intensifies our duty to reject the jury's verdict. Despite the concession by our dissenting brother that the question of materiality was one of fact for the jury, the startling concept is urged that we should, in effect, correct a gross injustice to the insurance company—which, incidentally, was represented by extraordinarily able counsel—by reversing and remanding for a new trial. Quite clearly our dissenting brother, dissatisfied with the jury's conclusion, reaches for a rationale to circumvent the verdict. But he has rested his argument on a reed that is a slim one indeed.

The dissenting opinion argues that the jury was improperly charged on the principle of weighing the materiality of any misrepresentations in the insurance application. The jury was, however, correctly instructed on the definition of materiality as set forth in the Massachusetts statute, *i. e.*, a misrepresentation is material if it increases the risk of loss to the insurance company. Moreover, the dissenting opinion notwithstanding, the jury's attention was directed to the testimony of Drs. Lambkin and Pepper concerning the company's risk:

We have had expressions of opinion that these were material in evaluating the risk of loss that the company assumed. Insofar as we have had opinions as to whether such conditions as you find that he was suffering from or had experienced constituted or established a risk of loss, then you can consider the opinion of the witnesses that this did materially adversely affect the risk of loss, if you believe that the witness was qualified and persuasive in his expression of that opinion.

Assuming *arguendo* that Judge Blumenfeld's charge contained the errors claimed in the dissenting opinion, we do not observe a "miscarriage of justice" so great that it would compel our *sua sponte* remedial action. Indeed, Judge Mulligan does not even suggest that the result would likely be different after retrial. Accordingly, we see neither reason nor justification to substitute our judgment for that of Guardian's competent counsel who did not object to the charge, nor even raise this claim of error on appeal, and, in fact, never requested a new trial in the interest of avoiding what our brother perceives to be the "miscarriage of justice" or "travesty" against the insurance company. Guardian instead has consistently sought judgment in its favor as a matter of law; but that is a judgment to which it is not entitled, as even our dissenting brother concedes.

The salient facts are not in dispute. When Dr. Robitaille was discharged from the Navy on July 1, 1969, at the age of 34, he was the victim of an incurable disease, multiple sclerosis. In fact, in December, 1969, he said it was obvious in retrospect that this disease had plagued him for nearly two years prior to his discharge. Although he enjoyed excellent health for most of his naval career, in the last two years of service he was afflicted with a series of disorders and symptoms which were most unusual for a man his age. In 1967, he began to notice a loss of force in the urinary stream which ultimately resulted in total retention in December, 1967. In June, 1968, he developed what he was to later term a "distressing positional vertigo associated with nystagmus." In layman's language, he had attacks of dizziness and oscillation of the eyeballs. He also suffered from blurred vision, which was originally considered to have resulted from congenital nuclear cataracts. In early 1969, he became aware of a numbness in the ulnar distribution of both hands and also experienced a vague sensory disturbance in his right leg. Dr. Robitaille was an internist, and the symptoms were so disturbing that he underwent two complete neurological examinations. He obviously suspected the true nature of the symptoms since he asked Dr. Patterson whether they could be caused by multiple sclerosis. While Dr. Patterson's examination showed no abnormalities, Dr. Kramer, a third physician with whom he discussed the matter, advised him that he considered this combination of symptoms to be "most unusual in a man of his age and [they] required further explanation." These examinations and this advice were given to Dr. Robitaille in April, 1969.

On June 17, 1969, Dr. Robitaille applied to Guardian Life for the policies in suit: a life insurance policy in the amount of $50,000, with a provision for waiver of premium in the event of total disability; a "non-cancellable" disability policy providing benefits of $800 per month for total disability for life; another disability policy providing an additional $800 a month for a five-year period, plus $400 per month for hospital benefits; and a fourth policy, termed a professional overhead expense disability policy, providing monthly benefits of $600 for a 12-month period. In his application for these policies, Dr. Robitaille filled out and executed an application which included "Representations to the Medical Examiner." The key questions at issue here and his responses thereto are set forth in the majority opinion. It is, in my view, crucial to this case that not a single response to any of the searching questions gave the slightest indication that Dr. Robitaille had suffered any of the disorders which gave rise to his fear that he was a possible victim of multiple sclerosis. Dr. Robitaille was not a layman but a specialist in internal medicine, and it is totally unreasonable to suppose that he failed to appreciate the significance of these disorders to an insurer who was issuing life and disability policies in reliance upon his representations. Within a few months thereafter, Dr. Robitaille's physical condition had so deteriorated that he could not continue in private practice. In November, 1969, he was hospitalized and the diagnosis of multiple sclerosis was finally made.

I

The appellant insurer has never claimed that Dr. Robitaille fraudulently concealed, or was guilty of bad faith in failing to reveal, the crucial symptoms. The preoccupation of the majority with the issue of his good faith is thus not really germane. The key questions in the application were not inquiries calling for an opinion. No questions were directed to his evaluation of his physical health or his freedom from a particular disease. The questions were factual and called for answers which were susceptible of precise formulation. Massachusetts follows the traditional distinction between subjective and objective representations, and it is well settled in that

state that an innocent misrepresentation of a material fact avoids the policy.[1]

I think that it is abundantly clear that Dr. Robitaille's responses to the factual inquiries of the insurer were palpable misrepresentations. His rationalization for answering or not answering questions fully as set forth in part III of the majority opinion is at best disingenuous. It is difficult to understand why he failed to report his blurred vision, his nystagmus and the diagnosed congenital nuclear cataracts when he was asked if he had any impairment of sight or any disease or disorder of the eyes. His explanation that he thought that the symptoms were due to naval gunfire in 1961 of course does not excuse his failure to report the disorders which he actually suffered. (On trial, the naval gunfire was identified as pistol fire on a practice range.)

Any doubts of misrepresentation tend to disappear when we consider his answer to question 9. There, he was asked whether or not he had undergone any diagnostic tests in the past five years. He responded: "Yes, as a matter of routine. All normal." In fact, during the previous five years he had undertaken a series of diagnostic tests which cannot be sensibly characterized as routine, since they were occasioned by the symptoms which he considered so troubling. In addition to an eye examination, a cystoscopy, urinalysis and glucose tolerance tests, he submitted to two complete neurological examinations by Dr. Grossi and Dr. Patterson. All of these were prompted by the complete urine retention of December, 1967, the blurred vision, the numbness of hands and leg, the disturbing vertigo and the nystagmus—none of which are reported in the application. Perhaps the most serious and blatant misrepresentation is found in his answer to question 13:

> In the past 5 years have you consulted or been treated or examined by any physician or practitioner (a) not named above?—Ans. No. or (b) for any cause not recorded above?—Ans. No.

The only physician named in the application was Dr. Urschel, who treated him for what Dr. Robitaille characterized as "[m]ild prostatitis in 1967." He made no reference at all to his two complete neurological examinations by Dr. Grossi and Dr. Patterson in April, 1969; his consultation with a third neurologist, Dr. Kramer; his examinations by Dr. Sacks and Dr. Bete for vertigo and nystagmus in June, 1968, and his complete opthamology examinations by Dr. Haskins in November, 1968.

I believe it is even more significant that when asked whether or not these examinations were occasioned by any "cause not recorded above," he simply responded "No." All of these consultations were prompted by the very symptoms which created his apprehension that he might have contracted multiple sclerosis. The question does not call for the diagnosis of the physicians visited or consulted but rather for the reasons which caused Dr. Robitaille to seek medical attention. On his trial, Dr. Robitaille admitted that a full and complete answer to the question would have required him to divulge his examinations with Dr. Haskins and Dr. Patterson and also, by implication, Dr. Sacks. Dr. Bete's examination was an annual physical, but this certainly could have been characterized as the reason for consultation. The application requested "complete information . . . [s]pecify-[ing] . . . conditions, severity, date, duration, frequency of attacks, after effects, and name and address of each medical practitioner and of each hospital." I do not think that there is any doubt but that Robitaille made numerous misrepresentations of fact which, if material, avoid the policy irrespective of his good faith in answering them.

1. See Metropolitan Life Ins. Co. v. Burno, 309 Mass. 7, 33 N.E.2d 519 (1941); W. Vance, Insurance § 68 (3d ed. B. Anderson 1951).

The appellee now urges that Dr. Robitaille's signature on the application giving the customary authorization to the insurer to contact any physician by whom, or any hospital at which, he was treated, in effect, made his naval medical history available to the ·insurer, and therefore excuses any misrepresentations he may have made. If this proposition were to be accepted as the law, it would not only encourage inadvertence and deceit by applicants but would, for all practical purposes, eliminate the defense of misrepresentation in life insurance cases. Risk selection is still the responsibility of the insurer and not the applicant. The majority opinion states that "in light of Dr. Robitaille's disclosure of all relevant diagnoses and his consent to an examination of the records at Newport Hospital, one must ask whether he nevertheless was under a duty to furnish details to Guardian." The answer, of course, is an unequivocal "Yes." It is a fundamental proposition in insurance law that the insurer has the right to rely upon the representations made in the application which induce the contract. It is only where the applicant's answers put the insurer reasonably on notice of some disability or disorder calling for further investigation that a waiver might be found.[2] Here, the answers supplied by Dr. Robitaille were not at all "indicative of something more [that was] tantamount to notice of the unrevealed." Cherkes v. Postal Life Insurance Co., 285 App.Div. 514, 516, 138 N.Y.S.2d 788, 790 (1st Dep't 1955) (Peck, J.). Dr. Robitaille's answers not only were not revelatory, they were positively reassuring: his

prostatitis was described as "mild" with "[n]o recurrence since 1967;" his high tone hearing loss, attributed to naval gunfire in 1961, was characterized as "[s]light" with "No difficulty, no change in audiograms since then;" his physical examinations were "routine" and "all normal." As we have indicated, he revealed no other consultations or examinations. I cannot subscribe to the view, and there is no authority at all for the proposition, that these responses should have put the insurer on notice that Dr. Robitaille might possibly be a bad risk.

## II

Although there were unquestioned misrepresentations here, I agree that it does not follow that the insurer has established its right to rescind and cancel the policy. The pertinent statute (Mass.Gen.Law Ann. c., 175, § 186) provides that a misrepresentation will avoid the policy if it is made with actual intent to deceive or where "the matter misrepresented . . . increased the risk of loss." The insurer did not choose to establish fraud or bad faith, as we have indicated, but rather relied upon the statutory alternative "increased the risk of loss." On trial, the insurer produced the medical director of Guardian Life, Dr. Lambkin, who testified that the insurer would not have accepted the risk had Dr. Robitaille properly answered the inquiries in the application. He testified that the facts not disclosed would have "markedly increased the risk of loss to the company." His explanation is revealing:

Well, in my opinion, with the sequence of an episode of acute urinary

2. Flanagan v. John Hancock Mutual Life Ins. Co., 349 Mass. 405, 208 N.E.2d 497, 500 (1965); Pahigian v. Manufacturers' Life Ins. Co., 349 Mass. 78, 206 N.E.2d 660, 666 (1965). See also Variety Homes, Inc. v. Postal Life Ins. Co., 287 F.2d 320, 323 (2d Cir. 1961); New York Life Ins. Co. v. Strudel, 243 F.2d 90, 93–94 (5th Cir. 1957); United States v. Kiefer, 97 U.S.App.D.C. 101, 228 F.2d 448 (1955), cert. denied, 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815 (1956); Cohen v. Penn Mutual Life Ins. Co., 48 Cal.2d 720, 312 P.2d 241, 246 (1957). In Great Northern Life Ins. Co. v. Vince, 118 F.2d 232, 236 (6th Cir.), cert. denied, 314 U.S. 637, 62 S.Ct. 71, 86 L.Ed. 511 (1941) (Michigan law), the court said that "even its own earlier records do not put the insurer upon notice of the falseness of statements in an application unless there is some circumstance which directs attention to them." See also Schrader v. Prudential Ins. Co., 280 F.2d 355, 360–362 (5th Cir. 1960).

retention, then later positional vertigo, then blurring of vision of one eye and finally with numbness of the hands would have strongly suggested an organic neurological disorder of a progressive nature.

The only other physician to testify on materiality was Dr. Pepper, former Senior Medical Director of Connecticut Mutual Life Insurance Company, who, on the basis of Dr. Robitaille's medical history as revealed on trial, testified that "[e]very insurance company that I know about would have to decline or postpone this application."

It is significant that the appellee produced not a single medical expert to contradict the testimony that this insurer, or any prudent insurer, would not have accepted the risk.

The majority argues that even if Dr. Robitaille had answered the questions fully, the insurer would not necessarily have diagnosed that he was a victim of multiple sclerosis. This is not really the issue. The question is whether or not a prudent insurer, alerted by complete and forthright answers in the application to the existence of a combination of symptoms indicative of neurological disorder, would have declined to accept the applicant because of the increase of risk. The amalgam of symptoms in a person of 34 years of age would unquestionably provoke some suspicion that serious neurological illness was present. It certainly created such apprehension in the mind of the applicant, Dr. Robitaille.[3] Dr. Greer did examine the applicant for the insurer on July 8, 1969, after Dr. Robitaille had filled out the medical statement which successfully obscured any indication of his disturbing symptoms. Had a full disclosure been made in the application, it would either have been refused or a further investigation would have ensued, which would have unquestionably led to a refusal. This was the testimony at trial, and there was nothing to rebut it. In June, 1969, Dr. Robitaille had been a victim of multiple sclerosis for two years; it was not in its early stages, and only five months later, he was so incapacitated that he was hospitalized and diagnosed as a victim of the debilitating and incurable disease.

### III

We eventually come to the position of the majority that, in any event, the question of materiality was one for the jury, and that, since the jury found against the company, the court below did not commit reversible error in refusing to set aside its verdict. Although no case in Massachusetts has taken the position that multiple sclerosis as a matter of law increases the risk of loss, this would not preclude a federal court from making the prediction that such a decision would represent the law of that Commonwealth. This is, it seems to me, particularly appropriate when we consider that four of the policies in suit involve disability benefits and multiple sclerosis is obviously disabling. However, I would not urge this point. I believe that the appropriate procedure here is to set aside the verdict and remand for a new trial. Respect for the jury system does not mandate that we embrace an aberrational verdict. It is conceded that the determination of materiality is normally one to be made by the jury, but the jury must be properly instructed.[4] Here the interrogatory submitted to the jury simply asks whether or not the defendant made or failed to make any statement in his application which "increased the risk of loss under the policies." There is no in-

---

3. In December, 1969, Dr. Kramer, supporting Dr. Robitaille's application for a medical discharge from the Navy, reported his conversation with him in the spring of that year and stated: "It seems clear to me that there can be no question now that the symptoms he related did present evidence of mul-

tiple sclerosis at that time. This combination of symptoms—dysfunction on a chance basis alone could not occur in a young man in the absence of neurological disease."

4. Levie v. Metropolitan Life Ins. Co., 163 Mass. 117, 39 N.E. 792 (1895).

dication in the interrogatory or any place in the charge to the jury as to the meaning of the term "increase in the risk of loss." The best proof of increase of risk is the practice of prudent insurers.[5] Would such an insurer issue a policy had it known the truth which the applicant's answers had concealed? Although the only medical evidence submitted on this point was on behalf of the company, no indication was given to the jury that this was an appropriate criterion. The comment of the majority that the jury was "fully aware of the proper legal standard which was to guide them" is thus misleading. The test of materiality has long been a subject of discussion by legal scholars in insurance law.[6] In this case, a group of laymen without any medical testimony bearing on the materiality of the misrepresentation except that in favor of the insurer, promptly returned a contrary verdict. The majority describes the facts here as "complex and technical" and yet the jury returned a verdict for the insured after only 20 minutes of deliberation. The result was predictable under these circumstances.

Dr. Robitaille, who, as a young physician with a large family, stood at the threshold of a private practice after 10 years of service in the armed forces of his country, and who became the victim of a dread disease, is a highly sympathetic figure even to a dissenting judge. Of course, no normal American jury can be expected to have any empathy for the insurer; insurance companies are, after all, less than charismatic institutions. It is particularly important, therefore, in a case such as this that the jury be properly and fully charged so that a just verdict can be rendered. The decision to reverse and remand here does not constitute a rejection of the jury system, but rather a recognition that the jury can only function appropriately if it is properly instructed as to the applicable law.

It seems to me that the verdict below is not sustainable and that it is not our role to sit idly by and supinely accept it.[7] It is true that the insurer made no

5. See Daniels v. Hudson River Fire Ins. Co., 66 Mass (12 Cush.) 416, 424 (1853) ; Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 72 F. 413, 429 (6th Cir. 1896) (Taft. J.). See also MacKenzie v. Prudential Ins. Co., 411 F.2d 781, 782 (6th Cir. 1969) ; Sovereign Camp, W. O. W. v. Moore, 237 Ala. 156, 186 So. 123 (1938) ; Mack v. Pacific Mutual Life Ins. Co., 167 Minn. 53, 208 N.W. 410 (1926) ; Volunteer State Life Ins. Co. v. Richardson, 146 Tenn. 589, 244 S.W. 44 (1922) (applying state laws resembling the Massachusetts law).

6. See, e. g., R. Keeton, Insurance Law § 5.-7(a) (1971) ; W. Vance, *supra* § 62.

7. Although this is a diversity action, the law of Massachusetts is not relevant to the question of whether or not this court may consider an erroneous charge on its own motion where the appellant failed to object below. This is a matter of procedure, as to which federal law controls. McNamara v. Dionne, 298 F.2d 352, 355 (2d Cir. 1962). The appropriate federal provision, Fed.R. Civ.P. 51, provides, *inter alia*, that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." In the ordinary case, therefore, an appellant will be precluded from asserting on appeal alleged errors in the charge which he failed to bring to the attention of the trial judge. E. g., Spano v. Koninklijke Rotterdamsche Lloyd, 472 F.2d 33 (2d Cir. 1973) (*per curiam*) ; Nielsen v. Charles Kurz & Co., 295 F.2d 692 (2d Cir. 1961), cert. denied, 369 U.S. 876, 82 S.Ct. 1147, 8 L.Ed.2d 278 (1962) ; Curko v. William Spencer & Son, Corp., 294 F.2d 410 (2d Cir. 1961). However, an appellate court can consider, on its own motion in exceptional cases, errors committed in the charge below, even though no requests to charge were submitted and no objections to the charge were made, whenever it is necessary to do so in order not to countenance plain error, egregious error or a miscarriage of justice. Hormel v. Helvering, 312 U.S. 552, 556–557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941) ; Sibbach v. Wilson & Co., 312 U.S. 1, 16, 61 S.Ct. 422, 85 L.Ed. 479 (1941) ; Mazer v. Lipschutz, 327 F.2d 42 (3d Cir. 1964) ; Ferrara v. Sheraton McAlpin Corp., 311 F.2d 294 (2d Cir. 1962) ; McNello v. John B. Kelly, Inc., 283 F.2d 96 (3d Cir. 1960) ; Troupe v. Chicago, D. & G. Bay Transit Co., 234 F.2d 253, 259–260 (2d Cir. 1956) ; Moore v. Waring, 200 F.2d 491 (2d Cir. 1952) ; Finn v. Wood, 178 F.2d 583, 584 (2d

objection to the interrogatory at trial or indeed on appeal. The majority characterize it as "ironic" that the only objection made to the interrogatory was by the appellee. More pungent adjectives come to mind. The fact that counsel did not take exception below only accentuates the travesty, and our action now is *a fortiori* mandated.

Cir. 1950) ; Shokuwan Shimabukuro v. Higeyoshi Nagayama, 78 U.S.App.D.C. 271, 140 F.2d 13 (1944). Although plaintiff failed to object to the charge given below, it did request the court to charge that the "test of materiality of a fact or a matter is determined by whether a reasonably careful underwriter would have regarded the fact or matter if revealed at the time of effecting the insurance, as substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium." Thus the attention of the court was directed to the problem of the appropriate standard of materiality.