RICHARD L. HOLMES, Retired Appellate Judge.
Angela Marie Johnson appeals from a summary judgment entered in favor of Centennial Life Insurance Company (Centennial); Parten & Maloy Insurance Agency; and its agent, Dickey L. Parten (Parten). This case is before this court pursuant to Ala. Code 1975, § 12-2-7(6).
At the outset we would note that on appeal, the appellate court must decide whether a genuine issue of a material fact exists. If the appellate court determines that no genuine issue of a material fact exists, then it must determine whether the moving party was entitled to a judgment as a matter of law. The appellate court must view the record in a light most favorable to the nonmov-ing party, and it must resolve all reasonable doubts against the moving party. McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957 (Ala.1992).
The facts, when viewed in a light most favorable to Johnson, reveal the following: Johnson obtained health insurance coverage through Centennial in December 1991. In January 1998 Johnson began to experience leg cramps and abnormal uterine bleeding which, she says, hindered her from performing the duties associated with her position as a welder. Johnson sought treatment from Dr. Buzhardt, a specialist,'who recommended surgery to correct Johnson’s problem. Johnson elected to have the surgery after Centennial precertified, or authorized, the surgery.
On May 5,1993, Dr. Buzhardt performed a hysterectomy, an anterior/posterior repair, and an enterocele repair on Johnson. It is undisputed that Johnson had not paid her May premium at the time she elected to have the surgery. Johnson testified that after she returned home from the hospital, she found some correspondence from Centennial and realized that she had not paid her May premium. Johnson stated that she immediately called Parten, who allegedly told Johnson, “you’re fine, but you’ve got to get [the premium] in the mail today.” Johnson stated that on that same day, she talked to two employees at Centennial, both of whom allegedly told Johnson to mail her premium that day. Johnson stated that she complied with these instructions and mailed both the May and the June premiums in Frisco City, Alabama, at the Frisco City post office on either May 31, 1993, or June 1,1993, paying the May premium within the 31-day grace period. The envelope containing Johnson’s premium payments, however, was postmarked on June 5, 1993, in Montgomery, Alabama. Centennial received Johnson’s payments on June 8, 1993, a few days beyond the 31-day grace period for the May payment. We would note that the trial court, in its order dated January 6, 1997, noted that there was a factual dispute as to whether Johnson had mailed her May premium within the grace period. Centennial, thereafter, informed Johnson that it had declined to reinstate her coverage based on non-payment of her May premium and that her coverage had lapsed as of May 1,1993.
Johnson filed a complaint against Centennial and Parten, alleging, among other things, breach of contract, bad faith refusal to pay health insurance benefits, and fraud. Centennial and Parten moved for a summary judgment. On January 6, 1997, following a hearing, the trial court entered :a summary judgment in favor of Centennial and Parten on all the counts. Johnson filed a timely *492 post-judgment motion, which the trial court denied.
Johnson appeals.

BREACH OF CONTRACT

On appeal, Johnson contends that Centennial breached its contract with her by refusing to pay the claims associated with, her surgery and that Centennial’s refusal was in bad faith. In support of its summary judgment motion, Centennial relied on the defense that Johnson had misrepresented her medical history on the application for coverage, although, as stated previously, Centennial terminated Johnson’s policy because it had received her May premium outside the 31-day grace period. The trial court granted the summary judgment motion, holding that the insurance contract was void because Johnson had made a misrepresentation on her application for coverage.
After carefully reviewing the record, we find that the record is replete with evidence indicating the existence of factual questions for a jury. We will first address Centennial’s defense of misrepresentation. The facts giving rise to the misrepresentation are as follows: In December 1991 Parten filled out the initial application for Johnson and asked Johnson if she had ever had any symptoms of, or consulted with a physician for, any disease or disorder of the “breast or reproductive system, such as fibrocystic disease, irregular menstruation, miscarriage, abortion, ectopic pregnancy or caesarean section.” Johnson responded “no” to this question.
It is undisputed that Johnson visited her physician in October 1988 for a postpartum examination, following the delivery of her fifth child. The medical notes for this visit state the following, in pertinent part:
“ Has been bleeding continuously since delivery, has never stopped. It got heavier last Thursday and she thinks that was probably when she started her normal menstrual period. She is still bleeding some today. On exam the uterus does not seem to be fully involuted and she wonders if the fibroid she has been known to have might be contributing to the bleeding and that is quite possible. Plan — start on birth control pill samples that we gave her today.”
We would note that Johnson relies heavily on the fact that her abnormal bleeding in 1988 was due to her fifth childbirth and that the bleeding stopped when she began taking birth control pills. Johnson stated that she was healthy when she applied for coverage with Centennial in December 1991. Johnson further stated that she remained healthy until January 1993, at which time she began to experience problems with abnormal bleeding. We would note that the record does reflect that Johnson had a history of uterine fi-broids. We would further note that the trial court, in its order dated January 6, 1997, stated that “[i]t is undisputed that the medical problem [Johnson] had was that she experienced heavy bleeding occurring only during her menstrual period which was previously treated by taking iron supplements.”
Centennial offered the affidavit of Cynthia A. Jefferson, the manager of association underwriting, who stated that if the company had known the truth regarding Johnson’s prior history of uterine fibroids and irregular menses, it would not have issued an insurance policy to Johnson.
We would note that our supreme court in First Financial Ins. Co. v. Tillery, 626 So.2d 1252, 1255 (Ala.1993), stated the following:
“[IJnsurers are not allowed to avoid coverage in every case of a misstatement by an insured, and the insurer cannot be allowed automatically to avoid coverage simply because its own employee testified that the company would not have undertaken the risk had it known the truth as to the particular fact. State Farm General Insurance Co. v. Oliver, 658 F.Supp. 1546 (N.D.Ala.1987), aff'd., 854 F.2d 416 (11th Cir.1988).
“... In order for an insurer to avoid coverage under § 27-14-7, Ala.Code 1975, ‘the representation or omission must have been “material” to the acceptance of the risk. The question of whether a particular fact is or is not material is almost invariably a question for the jury, which is entitled to consider the factual context in *493 which the determination is to be made.’ Oliver, 658 F.Supp. at 1552.”
(Emphasis added in Tillery.)
The criterion on materiality has been described as follows:
“If the fact concealed would have shown the liability of the insurer for the loss to be greater than appeared upon the facts disclosed, and would, in consequence, have induced a rational underwriter, governed by principles presumed to govern prudent and intelligent underwriters in practice, to have rejected the risk, or accepted it only at an increased premium, the fact is material.”
9 Ronald A. Anderson & Mark S. Rhodes, Couch on Insurance § 38:27 (2d ed. rev. 1985).
“In Alabama, the issue of whether a particular fact increases the risk of loss assumed by an insurance company is generally one for the jury.” Clark v. Alabama Farm Bureau Mut Cas. Ins. Co., 465 So.2d 1135, 1139 (Ala.Civ.App.1984).
We would further note that Alabama courts have recognized, as a matter of law, that some medical conditions automatically increase the risk of loss. See Miller v. Metropolitan Life Ins. Co., 214 Ala. 4, 106 So. 335 (1925) (Tuberculosis); Crumpton v. Pilgrim Health & Life Ins. Co., 35 Ala.App. 363, 46 So.2d 848 (1950) (Hodgkin’s disease); and Liberty Nat’l Life Ins. Co. v. Trammell, 33 Ala.App. 275, 33 So.2d 479 (1947) (overruled on other grounds) (Cancer).
Alabama has not yet recognized medical conditions associated with uterine fibroids and irregular menses as being conditions which would automatically materially increase the risk of loss. Thus, whether Johnson’s medical condition materially increased a risk of loss to Centennial creates a genuine issue of material fact. Accordingly, the trial court’s entry of a summary judgment based on the defense of misrepresentation was not proper.
Assuming, arguendo, that a jury finds that Johnson’s medical condition does not, in fact, create a material risk of loss to Centennial, then we must next determine whether Johnson presented substantial evidence in support of her claims of breach of contract, bad faith, and fraud.
After carefully reviewing the record, we would note that Johnson has presented substantial evidence on her breach of contract claim. Johnson relies on the “EXTENSION OF BENEFITS” clause contained in the policy, which states that “[a]n insured might be Totally Disabled at the time his or her insurance ends. In this case coverage for such disability will be extended for the Injury or Sickness causing the disability.” According to the policy, Johnson would be considered disabled if she was “prevented as a result of bodily injury or Sickness from engaging in any substantial part of ... her regular and usual activities.”
Johnson presented the following testimony from a case management coordinator at Centennial:
“A. If [Johnson] was totally disabled by definition at the time that the policy terminated, she would qualify for the extension of benefits.
[[Image here]]
“Q. Now, show us in that policy where it says that she’s got to submit some kind of document to prove that she’s totally disabled.
“A. It is not indicated that a document must be submitted. But in order for us to verify the total disability to allow the extension of benefits, that would have to be obtained.
“Q. Where does it say that in the policy?
“A. It doesn’t indicate that a document must be received in the policy. It just defines total disability.
[[Image here]]
“Q. All right. Now, are there any other criteria in this policy that she must meet in order to have her benefits extended by virtue of total disability as of May 1, 1993?
“A. She must only meet the definition of being totally disabled at the time her policy terminates.
[[Image here]]
*494 “Q. And that means that the claim would have been paid?
[[Image here]]
“A. The claim for the disabling condition would be paid.”
Johnson’s testimony indicates the following: She owned a welding service and a portable sawmill, both of which required her to engage in physical and manual labor; the duties associated with the welding service and sawmill constituted a substantial part of her regular and usual activities; two months prior to her surgery, she was unable to work in the oil fields and to operate the sawmill because of her medical problem; prior to her surgery, she informed Parten, her agent, that she was unable to “do anything”; and after the surgery, Dr. Buzhardt informed her that it would be anywhere from six to two and one-half months before she would be able to return to the type work that she actually performed.
Centennial, however, contends that it had no knowledge of Johnson’s alleged disability, that Johnson was a bookkeeper instead of a welder, that the duties associated with her bookkeeping constituted a substantial part of her regular activities, and that Johnson was not disabled from performing the tasks associated with her job as a bookkeeper.
Based on the foregoing, it is apparent that Centennial’s policy would require that it pay Johnson’s claim under the extension of benefits clause if (1) Johnson was totally disabled at the time her policy terminated on May 1, 1993; (2) Centennial had knowledge of Johnson’s alleged disability; and (3) Johnson’s welding duties, and not her bookkeeping duties, constituted a substantial part of her regular and usual activities. Thus, there are numerous conflicting issues which must be resolved by a trier of fact.
BAD FAITH
Our supreme court, in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982), outlined the following elements of proof for a “bad faith refusal” claim:
“(a) an insurance contract between the parties and a breach thereof by the defendant;
“(b) an intentional refusal to pay the insured’s claim;
“(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
“In short, [Johnson] must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, [Johnson] must show ■ that [Centennial] had no legal or factual defense to the insurance claim.”
(Emphasis in original.)
In the instant case we are bound to conclude that Johnson cannot prevail on her bad faith refusal claim, by virtue of the fact that Centennial did offer a legitimate and debatable ground for the denial of Johnson’s claims, i.e., payment of her premium outside the applicable grace period. Accordingly, we conclude that the trial court’s entry of a summary judgment on Johnson’s bad faith refusal claim was proper.

FRAUD

We would note that Johnson’s claims of fraud are rather convoluted. She first contends that Parten persuaded her to cancel her policy with World Insurance (World) and to obtain coverage with Centennial. Johnson states that Parten represented that coverage with Centennial would be the same or better than her insurance with World. Our review of the record; however, reveals that Parten did not solicit or persuade Johnson to cancel her policy with World. Johnson was apparently unsatisfied with the rates that World had to offer, and she voiced this to Parten, who searched for a company that had better rates. As, noted by the trial court, Johnson presented no evidence that the two policies differed.
*495 Johnson then contends that Parten, her agent, represented to Johnson that “if Johnson could not work because of an illness for which she was treated, her premiums would be excused until she recovered.” Our review of Johnson’s testimony, however, indicates that Parten diligently explained the contents of the entire Centennial policy to Johnson and that Parten worked closely with Johnson to service her needs. Johnson’s testimony reveals that she understood that the timely payment of premiums was a precondition of coverage under the contract. After carefully reviewing the testimony, we cannot conclude that any alleged representations by Parten were made to intentionally deceive Johnson. An intent to deceive is a necessary element of promissory fraud. Pinyan v. Community Bank, 644 So.2d 919 (Ala.1994).
Johnson further relies on the fact that Parten assured her that her policy would remain in force if she sent her May premium in the mail within the 31-day grace period. As stated previously, however, the envelope containing Johnson’s May premium was postmarked outside the grace period. Clearly, we cannot fault Parten for the fact that Johnson’s premium was received by Centennial outside the grace period. Accordingly, we conclude that the trial court’s entry of a summary judgment on Johnson’s fraud claims was proper.
Based on the foregoing, we reverse that portion of the trial court’s judgment entering a summary judgment on the breach of contract claim; we affirm that portion of the judgment entering a summary judgment on the bad faith refusal claim and the fraud claims.
The foregoing opinion was prepared by Retired Appellate Judge RICHARD L. HOLMES while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., concur in the result.